No. 47,888

JANET M. JENNINGS, DAVID COLWELL, VICI COLWELL McCOMB and PAULA MURDOCK, *Appellants and Cross-Appellees*, v. MARSH M. MURDOCK (Resigned as Trustee on October 19, 1971), and THE FIRST NATIONAL BANK IN WICHITA, *Appellee and Cross-Appellant,* and VICTORIA M. BLOOM, *Appellee.* As consolidated with in the Matter of the Estate of Marcellus M. Murdock, Deceased.

(553 P. 2d 846)

Opinion filed July 16, 1976.

*Paul R. Kitch,* of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *Thomas D. Kitch,* of the same firm, and *Verne M. Laing,* of Morris, Laing, Evans, Brock and Kennedy, Chartered, of Wichita, were with him on the brief for the appellants and cross-appellees.

*Charles W. Harris,* of Curfman, Brainerd, Harris, Bell, Weigand and Depew, of Wichita, argued the cause, and *Lawrence E. Curfman,* of the same firm, and *Sidney J. Brick,* of Wichita, were with him on the brief for the appellee and cross-appellant.

*Ronald K. Badger,* of Wichita, argued the cause and was on the brief for the appellee, Victoria M. Bloom.

The opinion of the court was delivered by

FOTH, C.: This is an action by beneficiaries of spendthrift trusts to compel their trustee to do their bidding in the management of the trust assets. Specifically, the plaintiff beneficiaries sought orders in the probate court and in the district court requiring the defendant bank as testamentary and *inter vivos* trustee, to vote corporate stock held in the respective trusts in accordance

with their wishes. For its failure to do so plaintiffs also sought in each court the removal of the trustee and the surcharge against it of their expenses (largely their attorney fees) in this litigation.

All together plaintiffs filed four petitions: in the probate court, one for directions to, and one for removal and surcharge of, the bank as executor and testamentary trustee; in the district court, one for directions to, and one for removal of, the bank as *inter vivos* trustee. In due course all four cases were consolidated in the district court for trial. The trial court held in substance that the trustee was required to comply with the beneficiaries' wishes unless it could show good cause for not doing so, but refused to remove or surcharge the bank as executor or trustee. The beneficiaries have appealed from the order refusing removal and surcharge, and from that part of the order allowing the trustee its expenses. The trustee bank has appealed from the order requiring it to follow the dictates of the plaintiff beneficiaries, and from the order allowing plaintiffs their expenses and attorney fees from the corpus of their respective trusts.

This is the second acrimonious chapter of the on-going dispute over the assets of the late Marcellus M. Murdock of Wichita, who died on March 10, 1970. The first chapter is to be found in *In re Estate of Murdock*, 213 Kan. 837, 519 P. 2d 108 (hereafter *Murdock I*). In that case this court upheld an antenuptial agreement between Marcellus and his widow Paula Murdock, limiting Paula to a one-fifth or "child's" share of his estate rather than the one-half she claimed as a widow who had not consented to her husband's will. *Murdock I* is referred to by the parties as the "widow's election" case, or simply as the "widow's" case. The dispute in the present case is over control of his chief asset, stock representing the balance of power in Wichita's daily newspaper, the Wichita Eagle and Beacon. Hence, this case is referred to as the "voting rights" case. Two more appeals in the Murdock estate (Nos. 48,058 and 48,067, consolidated) are docketed in this court awaiting decision.

In *Murdock I* we encountered for the first time Marcellus' family and his plan for the distribution of his assets after his death. In addition to his widow Paula, when he died at age 87 Marcellus left surviving three adult children (Victoria Murdock Bloom, Marsh Murdock, and Janet Murdock Jennings) and two adult grandchildren (David Colwell and Vici Colwell McComb), chil-

dren of a predeceased daughter (Jane Murdock Colwell). All of these offspring were the result of his previous marriage to Mabelle Murdock; none were related by blood to the widow Paula. His plan, to be detailed later, was to divide his assets into five equal parts. In due course, one was to go to his widow, one to each of the three surviving children, and the last equally to the children of the predeceased child. The plan was to be accomplished through a combination of an *inter vivos* and a testamentary trust.

Marcellus' chief asset was a one-third interest in the Wichita Eagle and Beacon Publishing Company, represented by 20,000 shares of stock, inherited from his father. Of the other two-thirds, one part (20,000 shares) had been inherited by his sister Pearl, and through her descended in 1962 to her grandson Harry B. (Britt) Brown. The other one-third had been inherited by Marcellus' brother Victor, and through him descended to Victor's daughter Katherine Henderson (10,000 shares) and Victor's grandson Victor Delano (10,000 shares).

The long-time internal strife in the Murdock family does not control the legal issues here, but it serves as the backdrop against which the present drama was played. During his lifetime Marcellus' one-third represented the balance of power over the newspaper. While Britt Brown's mother was alive part of her stock was in trust and was voted by Marcellus, giving him undisputed control. After she died Marcellus' stock stood between the competing one-third interests of Brown on the one side and the Henderson-Delano faction on the other. Marcellus had devoted his adult life to the newspaper and was its general manager for many years.

Under Marcellus' tenure Britt Brown served for a time as advertising director, but was fired from that position in the early 1960's when it came to light that he had been trading advertising space for merchandise without accounting to the paper. (He was later convicted of income tax violations based on these transactions for the years 1959, 1960, and 1961. His first conviction was reversed, *United States v. Brown*, 411 F. 2d 1134 [10th Cir. 1969], but he was again convicted on the same counts and the second conviction was affirmed in *United States v. Brown*, 446 F. 2d 1119 [10th Cir. 1971].) At about this time Brown came into control of his one-third of the Eagle stock as the result of the death of his mother in 1962. Shortly after his firing he combined the voting

power of his stock with that of Katherine Henderson and Victor Delano to force Marcellus out of the active management of the paper.

In 1963 Marcellus and Britt Brown reconciled their differences and entered into an agreement covering the management of the newspaper. An outside editor-publisher—John Colburn, of Richmond, Virginia—was to be hired under a ten year contract to be in active charge of the paper's operations. Marcellus was to be president and chairman of the board, and to serve in a consulting and advisory capacity. His name was to appear on the masthead to take advantage of his reputation as the long-time power behind the paper. Brown was to be vice-president and to receive training in all phases of the business with an eye to his becoming publisher after Colburn's contract expired. Marcellus, Brown and Colburn were to constitute a management committee to assist the publisher in his duties. The truce effected by this arrangement lasted until Marcellus' death seven years later.

Long prior to these events, on December 27, 1941, Marcellus had established the *inter vivos* trust, naming the defendant bank and himself as trustees. In the trust he placed 10,000 shares of Eagle stock, representing one-half of his one-third interest in the paper. The trust was to continue until two years after Marcellus' death. During his lifetime the income was to be accumulated or paid to him in the discretion of the bank. In practice it was accumulated, and in 1960 Marcellus renounced any right to income. In 1963, encountering a claim by income tax authorities that the trust income should nevertheless be taxed to him personally, Marcellus renounced all claim to either principal or income and resigned as co-trustee. His son, Marsh, named in the instrument as successor trustee, accepted the trust and served as co-trustee with the bank from then until the time this case was tried. (Marsh Murdock was originally a defendant in these actions, but resigned as co-trustee of the *inter vivos* trust on the day trial began and never qualified as executor or testamentary trustee. The trial court dismissed all claims against him, there is no appeal from that order, and no liability is now asserted against him.)

The *inter vivos* trust instrument after the habendum clause, paraphrased in part and emphasized where of particular significance, provided as follows:

*Article One:* Provided in part that "[t]he trust hereby created shall terminate two years after the death of the Donor."

*Article Two:* The donor reserved the right to add to the trust corpus.

*Article Three:* "The Donor hereby declares that *his purposes in creating this trust are 1) to create a present interest in the beneficiaries herein named in the Wichita Eagle, to the end that they will desire to perpetuate the same in the Murdock family; 2)* in recognition of certain understandings long since had with the beneficiaries and 3) for business reasons."

*Article Four:* Gave the bank the right to accumulate income, and went on to provide: "Upon the death of Marcellus M. Murdock the Trustee shall *forthwith divide the trust estate into five equal parts* or shares, which *for identification* are hereinafter referred to as 'Trust A', 'Trust B', 'Trust C', 'Trust D' and 'Trust E'. *Each of said parts shall be administered as a separate trust fund.*"

Each of the five parts was set aside for a named beneficiary who was to receive the income for the two years the trust would continue after Marcellus' death, and then the principal. The beneficiaries were the donor's wife Paula, whom he had married the year before, and his four children. (Alternative provisions were made in the event any of the named beneficiaries should die before the trust terminated, and it was under such a provision that David Colwell and Vici McComb succeeded to the interest of their mother Jane.)

*Article Five:* Prescribed the "rights and powers" of the trustees:

(a) investment and sale powers

(b) to invest without regard to statutory restrictions

(c) to allocate receipts between principal and income

(d) releases those dealing with the trustees from any duty to inquire

(e) to bind the estate contractually without personal liability and to employ "agents, brokers and attorneys."

(f) "All costs, charges and expenses of the trust estate and of the management thereof, and of their agents, brokers and attorneys, and all taxes, assessments and charges thereon shall be repaid and allowed to the Trustees from the trust fund."

(g) "In making distribution of the principal of the corpus of the trust estate, or of any part thereof, the Trustees in their uncontrolled discretion may make distribution to all or any of the beneficiaries hereunder in money and/or property of the trust estate. In making distribution in property *the Trustees shall not be required to distribute to any beneficiary an aliquot part of security or property*

*comprising the trust estate* at the time of distribution, and the judgment of the Trustees as to what shall constitute a proper division among them, and their selection and valuation shall be binding and conclusive upon all beneficiaries hereunder."

(h) "The Trustees are hereby given full and complete power and authority, without limitation or condition, over the trust estate and property, and each and every part thereof, as fully and to the same extent as any individual might, could or would have owning similar property in his own right."

(i) to retain indefinitely any assets placed in the trust by the donor without liability for any losses in value, although the trustees were to be subject to a standard of reasonable care in making other investments. This subsection concludes:

"In depositing hereunder an interest in the newspaper known as the Wichita Eagle, *the Donor expects that this interest in this family owned institution will be retained in the trust until such time as the family may dispose of the property*, in which event the Donor *desires* that the *Trustees hereunder join with the other members of the family* and dispose of the interest in the property which may be held under the terms hereof at such time."

(j) *"The Trustees are further authorized and empowered, in their discretion, to vote in person or by proxy upon all shares of capital stock held by them*; to unite with other owners of similar property in carrying out any plan for the reorganization of any corporation or association whose securities form a portion of the trust estate or any part thereof; to assent to the consolidation or merger of any corporation or association whose securities are held by them, with any other corporation or association; to pay all assessments, expenses, and sums of money as they may deem expedient for the protection of their interest as holder of the stocks, bonds, or other securities of any corporation or association *and generally to exercise in respect to all securities held by them, all the same rights and powers as are, or may be, lawfully exercised by persons owning similar securities in their own right."*

(k) to exercise general control over the corpus, concluding:

"It is the intention of the Donor that *the Trustees shall not be restricted as to the manner of handling of the trust estate* or the forms of investment of the corpus of the trust and the enumeration of the foregoing rights, powers and privileges shall not be so construed."

*Article Six*: In case of misfortune to or for the education of any beneficiary "the Trustees may invade the principal of the fund then under administration for the benefit of such beneficiary requiring such assistance and make such suitable provision in accordance with the circumstances as the Trustees may consider to be wise, suitable, proper and expedient. *Nothing in this paragraph contained shall create any legal or equitable rights in any beneficiary or any other person."*

*Article Seven*: "During the entire term of the trust, or trusts, as herein created, *the whole title to the trust fund or funds, both legal and equitable, in fee, and all parts of any of them, is and shall be vested solely and absolutely in the Trustees, and no interest therein whatsoever is or shall be vested in any of the beneficiaries thereunder,* it being the intention of the Donor that *the only interest which the beneficiaries hereunder shall have is personal property only, consisting of the right and power to enforce the due performance of the provisions of this trust agreement. Each beneficiary* under the trust created under the terms of this indenture *is without privilege or power to sell,* transfer, assign, pledge, mortgage, hypothecate, alienate, anticipate, *or in any manner encumber or affect his, her, or their claimed beneficial or legal title,* interest or estate in, or to the net income or principal of the trust herein created, nor shall such claimed interest or estate be subject to his or her liabilities, nor to execution or other legal process, including attachment and garnishment, bankruptcy proceedings or claims of creditors or others, and shall not pass or descend by operation of law. In the event any beneficiary hereunder shall attempt to transfer, or in any manner affect his or her claimed interest in the trust by voluntary act or by operation of law, or in the event any attempt is made to levy upon, or otherwise subject to legal process, any such interest in the income or principal, the payment of such beneficiary's income or principal shall thereupon, in the sole discretion of the Trustees, be made either to such beneficiary personally or the Trustee shall use same for the support and maintenance of such beneficiary."

*Article Eight*: Authorized distribution in kind upon termination of any trust.

*Article Nine*: Requires accountings and dispenses with bond.

*Article Ten*: Provides for Marsh as successor trustee to Marcellus, but makes the bank sole trustee if Marsh fails or ceases to act.

*Article Eleven*: "This trust shall be known as the Marcellus M. Murdock Trust." (The trust was familiarly referred to as the "children's Trust.")

In 1966, after the *inter vivos* trust had been in existence for almost twenty-five years, Marcellus executed the will discussed in *Murdock I*. After providing for the payment of debts and funeral expenses and a gift of the homestead and appurtenances to Paula, the will went on:

"All of the rest, residue and remainder of my property of whatever kind and wheresoever situated, I give, devise and bequeath to my trustees in trust for the uses and purposes hereinafter set forth. This trust fund shall be divided, held, administered and disposed of as follows:

"(1) The trust hereby created shall terminate 15 years after my death.

"(2) My trustees shall divide the trust property into equal separate shares, which, for identification, are hereinafter referred to as 'Trust A', 'Trust B', 'Trust C', 'Trust D', and 'Trust E'. Each of such parts shall be administered as a separate trust fund."

"Trust A" was designated for the widow Paula. In *Murdock I* we held this attempt to impress a trust on her one-fifth share was ineffectual in the light of the parties' antenuptial agreement, and that she was entitled to one-fifth of the residue outright. The other four shares were to follow the same plan of distribution as the corresponding shares of the *inter vivos* trust, except that "Trust E" was designated for the children of Marcellus' daughter Jane M. Colwell, who had died in 1963, rather than for Mrs. Colwell herself.

In paragraph (3) of the will the powers of the trustees were substantially identical to those granted under the *inter vivos* trust *Article Five*, described above, with subparagraphs "a" through "k" being those of the trust instrument almost verbatim. Paragraph (4) of the will is verbatim *Article Six* of the trust; paragraph (5) is *Article Seven;* paragraph (6) is *Article Eight;* paragraph (7) is *Article Nine* with this addition:

"If for any reason any beneficiary or any of the trusts shall be legally entitled to the legal as well as equitable title of said beneficiary's share of the trust corpus, then this will shall be construed so as to give, devise and bequeath the full legal and equitable title to such share of the trust corpus directly to such beneficiary and otherwise the provisions herein with respect to the trust created shall remain in full force and effect."

Paragraph (8) of the will, corresponding to *Article Ten* of the *inter vivos* trust, names Marsh and the bank as co-trustees, with the bank to be sole trustee if Marsh failed or ceased to act. The will, in place of the article identifying the trust by name, appointed

the bank and Marsh as co-executors, with the bank to act as sole executor if Marsh failed to act.

As may be seen, the only substantial difference between the trust provisions of the will and those of the *inter vivos* trust was that the testamentary trust was to continue for fifteen years after Marcellus' death, rather than the two years for the *inter vivos* trust. Additionally, the testamentary trust contained no statement of the testator's "purposes" in establishing it.

Upon the death of Marcellus the seven year truce within the Murdock family gave way to open hostilities. The widow Paula instituted the litigation which reached this court in *Murdock I*, claiming one-half of Marcellus' estate outright. She was supported in that position by her co-plaintiffs here, Marcellus' daughter Janet and his grandchildren David Colwell and Vici McComb, children of the deceased daughter Jane. She was opposed by Marcellus' two older children, Victoria Bloom and Marsh Murdock.

At the same time fire also broke out on a second front, resulting in the present struggle for control over the newspaper. This battle involves the collateral Murdock relatives as well as Marcellus' immediate family. Paula, Janet, David and Vici, the plaintiffs, are informally allied with Britt Brown and are represented by his personal attorney; opposing them again are Marsh and Victoria, who are allied in interest with Victor Delano and Katherine Henderson.

Immediately prior to Marcellus' death the board of directors of the publishing company was divided among three factions: Victor Delano and Katherine Henderson's husband Forrest represented the Delano-Henderson one-third; Britt Brown and his nominee Paul R. Kitch (counsel for plaintiffs here) represented the Brown one-third; and Marcellus and his son Marsh represented Marcellus' one-third. John Colburn, editor-publisher selected in the Marcellus-Britt Brown compromise of 1963, occupied the seventh seat. Less than ten days after Marcellus' death Britt Brown expressed an interest in becoming president and chairman of the board. Delano and Henderson had misgivings about the effect of such a move on the paper in view of Britt's pending federal tax prosecution; Marsh apparently shared their sentiments. On April 9, 1970, at the first board meeting after his death, the remaining board members filled Marcellus' seat on the board with Sidney J. Brick, who had been Marcellus' personal attorney during his lifetime and who became attorney for the bank as executor of his will. Britt Brown

and Paul Kitch opposed the election, voting for Janet Jennings instead. At the same meeting Marsh Murdock was elected chairman of the board and Victor Delano president; Brown and Kitch opposed both those selections as well.

When Marcellus' will was admitted to probate the bank qualified as executor and trustee, so his one-third stock interest was effectively controlled by the bank. Marsh Murdock and Sidney Brick became for practical purposes the bank's representatives on the board, carrying the balance of power between the Delano-Henderson faction on one side and the Brown-Kitch faction on the other. Colburn's vote, obviously, couldn't carry the day on any contested issue.

So matters stood as the scheduled annual shareholders meeting of November 5, 1970, approached, at which directors would be elected for the following year. In early October, 1970, Willard Hill, senior vice-president and trust officer of the trustee bank was approached by Paul Kitch, on behalf of Paula Murdock, Janet Jennings, David Colwell and Vici McComb. It was Mr. Kitch's position that his clients were the beneficial "owners" of the stock held in their respective trusts and that the trustee was obligated to vote such stock in any manner his clients might dictate. As he put it in a follow-up letter of October 13, 1970:

"It is the position of each of the above named *stockholders* that *the stock owned by them* be voted solely in their own individual interests in conformance with designations to be given you prior to the stockholders meeting." (Emphasis added.)

Upon receipt of this letter the bank promptly sought independent advice from its own attorney, Lawrence E. Curfman. Mr. Curfman, on October 20, 1970, rendered an eleven page opinion in which he analyzed the trust provisions and the law deemed applicable. He concluded in part:

"We are of the opinion that the Bank may, acting together with the co-trustee, vote the shares of stock held by it under the inter vivos trust in its discretion. We are further of the opinion that in so doing the trustees are not obligated to vote such shares in accordance with the desires of the trust beneficiaries, provided that in so exercising their discretion the trustees remain subject to their general fiduciary obligation to impartially administer the trust in the best interests of the trust estate and the beneficiaries."

The opinion went on:

". . . [I]t is the Bank's fundamental duty as a fiduciary to exercise its discretion for the ultimate benefit of the trust estate and the beneficiaries.

It is to be noted that the 'best interests of the beneficiaries' do not necessarily coincide with what these same persons regard as their best interests as individuals. It is for the Bank to administer the trust impartially as among the beneficiaries, and it is their common interests as beneficiaries which must serve as the Bank's guide. Certainly it is contrary to generally recognized trust principles to say that a trustee must follow the dictates of the trust beneficiaries in making such a determination. The beneficiaries' desires and opinions are clearly a factor which the trustees should consider and evaluate, but cannot be regarded as conclusive."

Upon receipt of the Curfman opinion and its consideration by the bank's trust committee the bank wrote all trust beneficiaries on October 23, 1970. After referring to the Kitch request and the Curfman opinion, the bank's letter said:

"This bank as fiduciary currently intends, although we reserve the privilege of changing our position, to vote such shares as we control in the exercise of our best discretion for the interests of the trust, its beneficiaries, and for the stability of the corporation. With this in mind, at this time we intend to vote the shares in favor of the existing Board of Directors except that, in place of the current representative of the Murdock estate and trust shares as held by this bank, we propose to submit the name of our President, Director, and Trust Committee Member, Paul H. Woods.

"We believe that this is evidence of our intent to vote the shares in our discretion for the best interests of the trust, its beneficiaries, and for the stability of the corporation."

Copies of the letter were sent to all counsel and to the officers and directors of the newspaper company. It evoked an immediate reply from Mr. Kitch. On October 28, 1970, he addressed a nine page letter to the bank, once again asserting that the beneficiaries were the "owners" of the stock in their respective trusts:

"You will note that our representation on this matter is on behalf of a substantial majority of the beneficiaries in the Childrens' Trust, all of the beneficiaries in the Janet M. Jennings Trust, all of the beneficiaries of the Jane Colwell Trust and all of the interest of Mrs. Paula Murdock. It is the opinion and position of Mrs. Jennings, Mrs. McComb and Mrs. Colwell that Mrs. Murdock is the true owner of an undivided one-half interest in the Murdock estate, so that in truth and reality we are representing the true owners of the three-fourths of all of the stock in the estate being administered by you. We do not feel that the wishes of these people should be so easily and obviously ignored by you to their detriment and to the possible advantage of you, your co-trustee and stranger stockholders and officers of the Eagle. In order to make the record crystal clear I wish to put in writing the following so that you can not claim any misunderstanding in the event of subsequent developments."

There followed an expression of dissatisfaction with the present status of the paper, both as to "the quality of its product" and

its "earning record," which were said to be at the "lowest ebb" of the paper's history. This was alleged to be attributable to its present "top management," although the present manager (Mr. Colburn) was thought to be "salvageable" if subjected to firm control by the board of directors. The letter proposed as directors John McComb, husband of Vici and a young Hutchinson banker, and Richard Jennings, son of Janet Jennings and a young Los Angeles attorney. The letter included a demand that all stock in the trust and the estate allocated to Paula, Janet, David and Vici be voted for their two nominees.

The Kitch letter went on to allege a conflict of interest on the part of the bank, in part because as executor it was defending the will, which meant opposing Paula's claim to half of the estate—a "shameful course of events" designed to deprive her of her "rightful property rights." It also alleged that a conflict of interest was inevitable because the desires of the various beneficiaries were in conflict and because Marsh, co-trustee of the *inter vivos* trust, was also a beneficiary.

As threatened in the letter, when assurances were not forthcoming that the bank would comply with its demands the first petitions herein were filed two days later, asking that the executor and trustees be directed to vote for plaintiffs' nominees. Voting of the shares was restrained by the court, and the question of the bank's right to vote them was effectually put over to the next annual stockholders' meeting, scheduled for November 4, 1971. The second two petitions, asking for removal, were filed in January, 1971.

The following year was consumed in extensive pre-trial discovery, culminating in a pre-trial conference on September 15, 1971. In the pre-trial order the four cases were consolidated. The court, through the administrative judge, found as a matter of law that on Marcellus' death five separate trusts came into being under the *inter vivos* trust instrument, and that "the corporate stock in the Wichita Eagle and Beacon Publishing Company, Inc., shall be voted in each individual trust for the best interests of the beneficiary of such individual trust."

The pre-trial order directed the trustees to furnish to the beneficiaries a breakdown of their proposed method of voting the trust shares, and the beneficiaries were directed to respond with their proposals. If there was disagreement, the following issues were

to be determined by the trial judge to whom the case would be assigned:

(a) Whether the trustees have the power to vote the shares of the individual trust in accordance with their own discretion as to what the trustees believe to be for the best interests of the beneficiary. The plaintiffs contend that the provisions of K.-S. A. 58-1205 (b) apply while the defendants contend that the conflict contemplated by that section is not present in the instant trust;

"(b) Whether the trustees have the power to exercise such discretion in view of the conflict alleged by plaintiffs between the various beneficiaries;

"(c) If the trustees are held to have the right to vote the stock, then is their proposed action an abuse of discretion under the evidence to be offered;

"(d) If the trustees are disqualified from voting the stock without Court authorization, then how should the stock be voted in each trust in order to serve the best interest of each beneficiary."

As to the stock held in the estate, the pre-trial order directed that "[t]he trial court shall determine in advance of trial whether the voting of the Eagle stock by the executor is governed by the terms of the testamentary trust or whether until distribution of the estate the Eagle stock is to be treated as a common asset of the estate with power in the executor to vote said stock without reference to the term of the trust . . ." If the stock was to be voted as part of separate trusts, the same procedure was to be followed as in the case of the *inter vivos* trust. If the bank was entitled to vote the stock as executor, then the issue would be whether the bank's voting proposal constituted an abuse of its discretion.

In the meantime the bank undertook an investigation into the affairs of the paper through the bank's president, Paul H. Woods. In his opinion of October 20, 1970, Mr. Curfman had advised the bank:

"As the foregoing suggests, the course of action indicated for the Bank is clear, regardless of the manner in which it finally determines to vote. Every necessary and appropriate action should be promptly undertaken by the Bank to advise itself fully as to the affairs of the corporation, and as to every aspect thereof which may bear upon the interests of the trust estate. Under the circumstances, we recommend that this be as rigorous and thorough as time permits. Such actions might include, for example, examination of corporate books and records, review of recent audits, tax returns and other financial information, interviews with key personnel, and the like. Each of the trust beneficiaries should be consulted, and any further steps suggested by them should be pursued, if possible. In short, the Bank should undertake every action which may be of possible assistance in the sound and impartial exercise of its discretion."

After completing his investigation Mr. Woods submitted a memorandum to the bank's trust department dated November 9, 1970, tracing the paper's financial progress from 1963, when Colburn was first employed as editor-publisher, through fiscal year 1970. In the memorandum Woods noted raw figures for the Eagle showing an increase in net worth for the eight years of 109.7%, despite payment of dividends of $3,428,000. Long term debt was reduced from $1,030,000 in 1963 to $286,000 in 1970, and sales increased 37%. He compared this performance favorably to that of Stauffer Publications, Inc., a midwest newspaper chain, and to that of another closely held midwest newspaper whose data were obtained through confidential sources. He also compared Eagle figures to published profit and sales ratios of 15 newspapers with assets of $1 to $10 million. He observed, "The Eagle shows up well above average on all of these ratios and is the highest of any on Profit Before Taxes to Total Assets. I must conclude from these comparisons that the Eagle is achieving above average performance."

The memorandum concludes:

"Mr. Kitch, in his letter to Mr. Hill under date of October 28, 1970, says in part:

'Our clients . . . are of the opinion that the newspaper in the last year has reached the lowest ebb that it has ever occupied in the quality of its product, in the top management position and in its earning record.' The 'quality of the product' is a matter of personal opinion and I doubt if it can be measured objectively. Likewise the 'top management position' if viewed by factors other than financial performance is opinion unless a question of honesty and integrity is concerned and I do not believe Mr. Kitch has made any such accusations. The matter of 'earning record' has been covered by this memorandum and Mr. Kitch's statement is obviously incorrect.

"It would seem that Mr. Kitch should advise his clients, all of our beneficiaries and ourselves what his proposal is for replacing the present management before that step is taken. Certainly our Trust Committee has taken no irreversible stand on management of the Eagle, but all of us should be fully advised how Mr. Kitch proposed to improve the present situation. Our beneficiaries have every right to raise this question, as do we."

The result was a determination by the bank's trust committee to maintain the status quo at the Eagle until the opposition group came forward with concrete suggestions for improvement.

The following April, 1971, David Colwell met with the bank's trust officer, Willard Hill. At that meeting David suggested as a potential board member his father, Ward Colwell, a Texas newspaperman. Hill was receptive to the idea, and wrote to David

on April 23, 1971 that "our bank has understood that Ward Colwell is experienced in the newspaper field and we are favorable to the possibility of voting estate shares for him rather than Paul H. Woods [president of the bank]." Woods, it appears, had been suggested by the bank as a substitute for Sidney Brick in Marcellus' old board seat. As to substituting Richard Jennings for Marsh Murdock, Hill could not be so optimistic. Although saying the bank had "no prejudice for, or against" Jennings as a director, Hill observed that Marsh had been a director for many years, and further, "[h]e is a co-trustee of the inter vivos trust and any voting decision is necessarily a joint matter between Mr. Murdock and this bank and it does not seem likely that he would vote to remove himself."

In the letter Hill reiterated the bank's position on maintaining the status quo:

"Our bank follows the financial progress of the paper and we are aware that some stockholders feel that management has not been meeting its responsibilities; however, we do not fully concur but, in any event, no specific substitute for existing management has been suggested to us. We, therefore, would be reluctant to support any move to oust present management unless, and until, other management was suggested to us which we felt would be better able to cope with the problems of the newspaper."

This was the position of the bank when, on September 21, 1971, it was required by the pre-trial order to advise the beneficiaries how it proposed to vote the shares in the estate and in each of the *inter vivos* trusts. The bank and Marsh, as co-trustees, proposed to vote for Ward Colwell all shares held in the *inter vivos* trusts of Paula, Janet, David and Vici. Under cumulative voting, with each share casting seven votes, this would give him 42,000 votes. The shares in the trusts for Marsh Murdock and Victoria Bloom were proposed to go to Marsh, for 28,000 votes. As executor, the bank proposed to divide the vote of the estate shares, 60,000 for Sidney Brick and 10,000 for Marsh.

On October 19, 1971, the day the case came on for trial, Marsh resigned as trustee and stated he would not stand for reelection to the board. The bank as sole trustee then notified the beneficiaries that it intended to cast the votes originally intended for Marsh for Paul Woods. As executor, it proposed to shift to Mr. Woods an additional 10,000 of the votes originally designed for Sidney Brick. Votes controlled by the bank would then go 42,000 to Ward Colwell, 50,000 to Sidney Brick, and 48,000 to Paul Woods. Obviously if

Mr. Colwell were to be elected he would have to secure some votes from either Victor Delano, Katherine Henderson, or Britt Brown.

The trial court at that point required the bank to break down its proposed vote of the shares in the estate according to the interests of the individual beneficiaries. Dividing the estate into five parts (including one for David Colwell and Vici McComb together) the bank proposed to vote ⅖ths (*i. e.*, 4,000 votes) of each part for Woods and ⅗ths (*i. e.*, 10,000 votes) of each for Brick. The net result would be the same as under its first proposal of October 19th.

Victoria Bloom and Marsh Murdock expressed satisfaction with the bank's proposal. Accordingly, under one of the provisions of the pre-trial order, they were dismissed from the lawsuit in their capacities as beneficiaries. Since they were found to have no interest in how the executor-trustee voted shares in the estate or in any of the *inter vivos* trusts other than their own, they were excluded from participation in the trial.

As the case went to trial, then, the positions of the parties were essentially these: Plaintiffs contended they were in effect the owners of the stock in both three of the *inter vivos* trusts and in three of the testamentary trusts; the trustee was bound to vote the stock as they demanded. The bank contended that under both the *inter vivos* trust instrument and the identical trust provisions of the will it was ultimately required to exercise its own independent judgment as to what was in the best interest of each trust and each beneficiary; and further, that until administration was complete, and particularly until the "widow's election case" (*Murdock I*) was resolved, it was impossible to establish separate testamentary trusts because there was no way of knowing how much would be in the residuary estate.

The case was tried at length. At the conclusion of the plaintiffs' evidence the court dismissed the action as to Marsh as co-trustee, on the ground that his resignation had made the matter moot. The bank then put on its evidence and in due course the court entered its findings of fact and conclusions of law. The most significant of the latter (as amended) were these:

"1. The Irrevocable Trust Agreement known as Marcellus M. Murdock Trust (inter vivos trust) is clear and unambiguous.

"2. It was the intention of the settlor that the beneficiaries participate in the administration of their trust although the trustee was the one who was to control and disseminate the wishes of the beneficiaries for their own best interests.

"3. The trustee cannot be ordered to do every bidding of the beneficiaries nor can it ignore the wishes of the beneficiaries.

"4. The provisions of Article Three of the inter vivos trust clearly sets out that the trust should be so managed as to keep the Wichita Eagle and Beacon in the Murdock family and the trustees must cooperate with the beneficiaries to that end.

"5. That so long as a majority of the beneficiaries desire to participate in the workings of the Wichita Eagle and Beacon the trustee must strive to serve that end.

"6. When the trustee votes or threatens to vote shares in a manner which would alienate the interest and participation of a majority of the beneficiaries in the affairs of the Wichita Eagle and Beacon, then the beneficiaries have an absolute right to maintain a suit to enjoin the trustee from such action.

"7. The trustee must consider the wishes of the beneficiaries of each trust and if those wishes are not destructive of the purposes of the trust as elsewhere herein enumerated then that request must be followed by the trustee.

"8. The plaintiffs have no adequate remedy at law.

"9. The trustee shall not, during the continuance of the trusts, act contrary to the wishes of the beneficiaries in so far as the voting of shares is concerned except under order of a court of competent jurisdiction and on application must set forth a full disclosure as to the reasons for denying the wishes of the beneficiaries and the reasons why such denial is in the best interests of the beneficiaries.

"10. [as amended] The trustee shall not vote the shares in the inter vivos trust and in the testamentary trust held for the benefit of the same beneficiary differently as the purposes as set out in the inter vivos trust are also the purposes of the testamentary trust.

"11. The trustee is to vote the shares of the beneficiaries in both trusts as requested by them unless upon proper application good cause is shown why such procedure would defeat the purposes of the trust and would be injurious to the trust estate and the rights of each beneficiary.

"12. The commercial account of the Wichita Eagle and Beacon is a source of profit to the trustee and therefore presents a constant opportunity to weigh questions involving the trust. Because of the possibility of conflict the trustee must be above any question of compromise and in the event of disagreement between the management and control of the Wichita Eagle and Beacon and the beneficiaries, if the trustee refuses the request of any of the beneficiaries as to how his or her shares should be voted, then said trustee must relinquish either the commercial account or the trust.

"13. The removal of a trustee is a drastic action which should only be taken when the estate is actually endangered and intervention is necessary to save trust property. Such is not the instant case and the trustee has not breached its duties in such a way as to warrant removal.

"14. The trustee shall advise all beneficiaries of all actions taken in each trust and shall advise the beneficiaries as to any persons with whom the trustees have counseled or discussed matters pertaining to the administration of the trust."

As may be seen, the net effect of the decision was to put control of the voting in the hands of the beneficiaries. If the trustees' discretion would dictate a contrary course, the burden was put

upon it to convince a court that the beneficiaries' wishes would be injurious to the trust estate. The bank in its cross-appeal urges that these conclusions reverse the proper roles of trustee and beneficiary and this we view as the primary issue on appeal.

Looking first to general principles, we find: "The accepted rule is that where the instrument creating a trust gives the trustee discretion as to its execution, a court may not control its exercise merely upon a difference of opinion as to matters of policy, and is authorized to interfere only where he acts in bad faith or his conduct is so arbitrary and unreasonable as to amount to practically the same thing." (*Elward v. Elward*, 117 Kan. 458, 459, 232 Pac. 240.) In that case the trustee was directed to furnish to the beneficiaries "a comfortable maintenance and support in keeping with their habits and condition in life." An order increasing a beneficiary's monthly allowance was affirmed on a record containing none of the evidence. It was presumed that the trial court's implied finding of bad faith was supported by the evidence, thus meeting the requirement of the rule that "a court will not 'at the instance of interested parties, interfere with the performance of his duties by the trustee and the exercise of the discretionary powers conferred upon him, unless there is shown bad faith on his part, or a gross and arbitrary abuse of discretion'." (*Ibid.* See also, *In re Estate of Gustafson*, 178 Kan. 230, 284 P. 2d 615; *Henshie v. McPherson & Citizens State Bank*, 177 Kan. 458, 280 P. 2d 937.)

The American Law Institute puts the rule this way:

"Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." (Restatement of Trusts, Second, § 187.)

Generally speaking, the duty to administer a trust and to exercise the discretion vested in him rests on the trustee, and cannot be delegated by him to others. Restatement of Trusts, Second, § 171; Scott on Trusts, § 171.

The beneficiaries have no right to demand that the trustee's discretion be delegated to them. *In re Sullenger's Estate*, 2 Ariz. App. 326, 408 P. 2d 846. In that case the heirs requested the executor bank to retain the testator's assets, including some $70,000 worth of stock. The executor nevertheless sold the stock for about $4,000 less than its appraised value. When the stock's market value increased some $30,000, the heirs sought removal and surcharge. The trial court dismissed the action after hearing the heirs' evidence.

On appeal the judgment was affirmed, the court finding that the executor had been given discretionary authority to sell and had not abused its discretion. As to the expressed wishes of the heirs the court said:

"We are further convinced that the appellee did not breach an existent duty by failing to abdicate its own judgment in favor of the wishes of the heirs. By will the testator cloaked the executor with discretion in the disposition of estate assets, and although cooperation between executors and beneficiaries *is* sufficiently desirable that several courts have held that a representative has the *right* to follow the wishes of heirs, . . . this court knows of no rule which imposes upon the representative a *duty* to acquiesce in such wishes." ( 2 Ariz. App. at 328.)

The rule was put more strongly in *Estate of Talbot,* 141 C. A. 2d 309, 296 P. 2d 848. There one of the income beneficiaries—a competent and experienced businessman—suggested to the bank trustee that it should sell the trust's common stock portfolio at a substantial profit, invest the proceeds in municipal bonds, and look for a more favorable time to get back into the market. The beneficiary (Frederick C. Talbot) was the only one who had taken much interest in the administration of the trust, and assured the trustee he would secure the consent of the other beneficiaries. The trustee followed the advice, causing the trust to pay substantial capital gains taxes and reducing the overall yield on its portfolio. The securities sold thereafter increased in value. At the suit of a nonconsenting beneficiary having a one-third interest in the trust the trustee was surcharged one-third of the capital gains taxes paid. The court observed that from the evidence it could be concluded that "the trustee did not exercise an independent judgment or discretion in these transactions, but simply followed the suggestions and desires of Frederick C. Talbot upon his assurance that the other beneficiaries would consent. This was a breach of the trustee's duty." (141 C. A. 2d at 319.) The court held:

"Under the general law and the 'prudent man rule' of [the California code] controlling investment of funds by a trustee, he must exercise his independent discretion and judgment in reference to investment of funds, even where broad discretionary power of investment is given." (*Id.,* Syl. para. 1.)

"A trustee breaches his duty by failing to exercise his independent judgment and discretion in selling trust securities." (*Id.,* Syl. para. 4.)

As to a claim that the trustee should be surcharged for the subsequent appreciation of the stock, the court observed, "[t]he breach was not of the duty to retain the stocks, but of the duty to exercise an independent judgment. The two duties are obviously

separate and distinct." (*Id.* at 326.) On this issue the court held:

"Where a trustee has broad powers of sale of trust securities, a beneficiary has no right to compel retention of any specific stocks in the trust." (*Id.,* Syl. para. 6.)

The duty of a trustee to exercise judgment independent of the wishes of the beneficiaries, especially of a spendthrift trust, was recognized in *Loud v. Union Trust Co.,* 313 Mo. 552, 281 S. W. 744. There, failure to consult with trust beneficiaries before selling trust assets was held not to indicate bad faith. The fact that the trust was in the nature of a "spendthrift trust" indicated to the Missouri court that "it was the intention of the testatrix to substitute the judgment of the trustee for that of the beneficiaries in the management and sale of the trust estate." (313 Mo. at 609.)

A similar rule was applied in *In re Equitable Trust Co.,* 26 Del. Ch. 203, 26 A. 2d 241, the court finding no requirement that the trustee consult with the beneficiaries before selling trust property, where the will granted broad powers to the trustee and contained no notice requirement.

It was also applied to a clause authorizing a discretionary invasion of principal for the benefit of an income beneficiary in *Murray, Appellant,* 142 Me. 24, 45 A. 2d 636. It was there contended that the trustees were entitled to rely on the good faith of the testator's widow in making a modest request—one which her late indulgent husband would surely have granted. The contention was rejected: "There can be no delegation of discretion to the beneficiary, and the trustees are bound by the instructions of the testator in his will, rather than by an assumption that he would not expect them to be so bound." (*Id.* at 30.) The trustees were surcharged for their reliance on the beneficiary, the court saying:

"Here, the trustees did not use their own discretion. They left the determination to the beneficiary, and thereby surrendered their own discretion to her. They did not use their own judgment." (*Ibid.*)

Voting stock, as we see it, is no different from the purchase or sale of assets, the invasion of principal, or any other aspect of the administration of a trust. Where discretion is vested in a trustee, it is the trustee's discretion which must govern and not that of the beneficiaries. Scott on Trusts § 193.1, puts it this way:

"Where shares of stock are held in trust, the trustee may attend meetings of the shareholders and vote at such meetings as holder of the shares. In voting the shares he is under a duty to vote in such a way as to promote the interests of the beneficiaries. The trustee has discretion whether and how to

vote, and if he does not abuse his discretion the court will not interfere." (See also, cases noted therein.)

Illustrative of this principle and strikingly parallel to the present litigation are two Alabama cases involving an intrafamilial struggle for control of the Ingalls Iron Works Company. The company was founded in 1909 and grew into a multi-million dollar, multi-corporate structure under the guidance of its founder, Robert I. Ingalls, Sr. Over the years some 40% of the company's stock was placed in seven different family trusts. The trustees of each differed, but together included Mr. and Mrs. Robert I. Ingalls, Sr., Robert I. Ingalls, Jr., the First National Bank of Birmingham and M. F. Pixton (an unrelated individual). The income beneficiaries of six of the trusts were the minor children of Robert, Jr., and these trusts were involved in *Ingalls v. Ingalls*, 357 Ala. 521, 59 So. 2d 898. Robert, Jr., was the beneficiary of a seventh trust, involved in *First Nat. Bank of Birmingham v. Ingalls*, 257 Ala. 536, 59 So. 2d 914. He also owned some 30% of the company's stock outright.

The two Roberts worked together in the company (including its subsidiaries) for several years, as officers and directors. In 1948, however, they had a falling out and Robert, Sr., as chief executive officer, discharged his son from all positions in the company except that of director. The directorship was subject to vote of the stockholders, including the family trusts. Robert, Jr., in an effort to regain his position in the company and acquire control over it, instituted a number of suits. One of them was *Ingalls v. Ingalls*, supra, in which he sought to remove the other trustees of six of the trusts on allegation that they wrongfully withheld income from his daughters, wrongfully invested and used trust assets, and exhibited hostility towards Robert, Jr., their co-trustee. The withholding of income and wrongful investment charges do not concern our issue here, except for the tests laid down for removal of a trustee:

"It has been said that a court should be more reluctant to remove a trustee appointed by the settlor than one selected by itself. In re Bailey's Estate, 306 Pa. 334, 159 A. 549; Shelton v. McHaney, 343 Mo. 119, 119 S. W. 2d 951; Willson v. Kable, 177 Va. 668, 15 S. E. 2d 56. See Scott on Trusts, § 107.1.

"The removal of a trustee is a drastic action which should only be taken when the estate is actually endangered and intervention is necessary to save trust property. In re Crawford's Estate, 340 Pa. 187, 16 A. 2d 521; In re Hodgson's Estate, 342 Pa. 250, 20 A. 2d 294; Chambers v. Mauldin, 4 Ala. 477; Satterfield v. John, 53 Ala. 127. This is especially true where the trustee is named by the settlor. In re Crawford's Estate, supra; Taylor v. Errion, 137

N. J. Eq. 221, 44 A. 2d 346, affirmed 140 N. J. Eq. 495, 55 A. 2d 11." (257 Ala. at 527.)

One of the charges made against the trustees was that they voted trust shares in favor of directors nominated by Robert, Sr., at his instigation. Of this charge the court said:

"The Bank, Mrs. Ellen Gregg Ingalls and M. F. Pixton, as trustees, were confronted with the problem of so voting the stock of Ingalls Iron Works Company held by the several trusts of which they were trustee as to best insure the proper conduct of the business of that company, inasmuch as in some of the trusts the entire corpus consisted of its stock and such stock constituted the most valuable part of the corpus of all of them. The Ingalls Iron Works Company must continue to prosper and pay dividends on its stock or the very lifeblood of the trusts will be lost. In voting to continue the management which unquestionably had led the company into its strong financial position, we do not think it can be said that this course was pursued under the domination and control of Mr. Ingalls, Sr., to the detriment of the trust estates." (*Id.* at 532-3.)

In the second case, *First Nat. Bank of Birmingham v. Ingalls,* supra, Robert, Jr., sought removal of the bank as trustee of the seventh trust on grounds which included its allegedly malicious agreement to vote him out of his directorship. The court noted that "[t]he bank was confronted with the necessity of determining whether it was to the best interest of Ingalls Iron Works Company and accordingly of the trusts to have Robert I. Ingalls, Jr., serve on the Board of Directors of the company. The bulk of the assets of the trusts consisted of shares of capital stock of Ingalls Iron Works Company." (257 Ala. at 545.) The bank explained its vote by saying that it thought the welfare of the company, and hence of the trusts, would be best served by retaining the present management under which the company had prospered, and the removal of Robert, Jr., who was a source of dissension. The court observed of this:

"The foregoing statement has been considered with care. We see nothing in it to indicate any malicious or willful disregard of duty. The concern of the bank as trustee appears to have been what was in its sound judgment for the best interest of the trust estate. Conceding for the sake of argument that it should have reached another conclusion, we do not think that its action in this matter should be imputed to bad feeling or improper motive. . . . *It was the duty of the bank to determine in its best judgment what was for the best interest of the trust estate in all its aspects rather than what one beneficiary might conceive to be his personal interest.* And this was especially true when in the judgment of the bank accordance with the personal wishes of one beneficiary might result in loss to the trust estate as a whole. In view of the opinion of the bank that the presence of Robert I. Ingalls, Jr., on the Board of Directors of Ingalls Iron Works Company would not be for the best interest of the trust estate, it would have been a violation

of the bank's duty as trustee to have voted to place him on the board." (*Id.* at 545-6. Emphasis added.)

The result in each case was a reversal of the lower court's order removing the trustees. Their job was to see to the best interests of each trust estate. In voting stock held in the trust, they were to vote for management which would in their best judgment best serve the company. And this was so despite the fact that their decision ran directly contrary to the personal wishes of a beneficiary of one of the trusts, who was also a co-trustee. As the court there said, "[t]he best interests of the trust estates must not be confused with the personal welfare of Mr. Ingalls, Jr." (257 Ala. at 535.)

How, then, in the face of this universally accepted rule, did the trial court in this case come to the conclusion that the trust beneficiaries should be able to tell their trustee how to vote stock in their trusts? The only basis suggested is the language found in Article Three of the *inter vivos* trust in which Marcellus declared that one of his purposes in creating it was "to create a present interest in the beneficiaries herein named in the Wichita Eagle, to the end that they will desire to perpetuate the same in the Murdock family." The trial court apparently took that language to mean that anything a beneficiary proposed which indicated an interest in the operations of the paper was *ipso facto* in furtherance of the purpose of the trust, and must therefore control. We think such a construction puts altogether too much emphasis on an isolated, and to us ambiguous, portion of the instrument.

The parties are in severe disagreement as to what the phrase "present interest" in the Eagle means. The bank suggests that the phrase is used in a legal sense of conveying a present financial interest. Marcellus' motivation in using the phrase, it suggests, was to express a purpose connected with life so as to avoid the estate tax consequences attendant upon making a gift in contemplation of death. The beneficiaries, on the other hand, put their emphasis on the word "interest," and urge that Marcellus used it in the sense that he wanted his beneficiaries to be "interested" in the affairs of the Eagle.

Although, as will be discussed, we do not think it necessary to resolve this particular semantic struggle, we think on balance the bank has the better of it. The argument of the beneficiaries, it seems to us, leaves too many unanswered questions. In the first place, if this phrase was to be the touchstone of intent and the

light guiding all the trustees' actions in administering the trust, why was such cryptic language employed? It would have been a simple matter for the expert draftsman of the *inter vivos* instrument to have spelled out such an intent in unambiguous language. At the very least the instrument could have suggested means by which the beneficiaries' "interest" in the paper was to be cultivated by the trustees.

Secondly, the will contained no comparable expression of purpose. If such an expression was to be the dominant clause and ultimate guide to those administering his assets after he died, why was it omitted from those trust provisions which would outlive him by a full fifteen years? In the *inter vivos* trust it was almost surplusage as a guideline, since he himself was originally a trustee, and after resigning was nevertheless in a position to furnish personal guidance as to his intention. Under that instrument there would be only the two years after his death during which the trustee would be required to look to the trust instrument to find out what Marcellus' intentions were. We find it hard to believe that he would insert a provision intended to express an overriding purpose for that limited period, yet omit any such provision for the fifteen years of the testamentary trusts.

Thirdly, the trust was drawn in 1941, and any intended "present interest" of the beneficiaries must have come into being at that time. If he really expected in 1941 that his beneficiaries should take a present "interest" in the Eagle, why did he take no personal action to encourage their participation? Yet the record shows that none of the beneficiaries took any active part in the affairs of the Eagle except Marsh, who served only as a director. Other members of the family may have displayed an academic interest, or held jobs briefly while in school, but none, so far as the record shows, exhibited any inclination toward a newspaper career. The only member of the Murdock family who was really active was Britt Brown, who of course was not a beneficiary. By 1966, when Marcellus drew his will, his family's "interest" in the Eagle for the past twenty-five years must have been abundantly clear.

The reason we do not think it necessary to determine what Marcellus meant by the disputed phrase is that the intent of a donor or testator is not to be determined from a single clause standing alone, but from the four corners of the instrument. We have but recently reiterated our long-standing rule:

"The paramount rule of construction in the interpretation of provisions in a will, to which all other rules are subordinate, is that the intention of the testatrix as garnered from all parts of the will is to be given effect, and that doubtful or seemingly inaccurate expressions in the will shall not override the obvious intention of the testatrix. (*Schauf v. Thomas*, 209 Kan. 592, Syl. para. 2, 498 P. 2d 256; *In re Estate of Truex*, 205 Kan. 169, Syl. para. 1, 468 P. 2d 237.) In construing a will the court should place itself as nearly as possible in the situation of the testatrix when she made the will, and from such a consideration and from the language used in every part of the will the court should determine as best it can the purposes and intentions of the testator as gleaned from the language used." (*In re Estate of Hannah*, 215 Kan. 892, 897, 529 P. 2d 154.)

In an earlier day we said that the rule was that "to ascertain the character and extent of a devise of real property all the provisions of a will pertaining thereto must be read and construed together, not by giving controlling significance to one of the terms of the devise and ignoring the others." (*Hinshaw v. Wright*, 124 Kan. 792, 262 Pac. 601, Syl. para. 1.)

Putting aside, therefore, the troublesome "present interest" clause, we look to the balance of the two trust instruments. We find in each, among the trustee's powers recited above: § h, giving the trustee an owner's control over the trust property; § j, giving the trustee the right to vote stock in the trust; and § k, giving the trustee the broadest possible authority in handling the trust estate in general.

By contrast, the beneficiaries' interest is strictly limited:

"During the entire term of the trust, or trusts, as herein created, the whole title to the trust fund or funds, both legal and equitable, in fee, and all parts of any of them, is and shall be vested solely and absolutely in the Trustees, and no interest therein whatsoever is or shall be vested in any of the beneficiaries thereunder, it being the intention of the Donor that the only interest which the beneficiaries hereunder shall have is personal property only, consisting of the right and power to enforce the due performance of the provisions of this trust agreement."

This provision is followed by conventional "spendthrift" language, making the beneficiaries' interest unassignable either by voluntary act or by operation of law. The bank, in its discretion, is authorized to invade the principal of the trust for any beneficiary, but the paragraph authorizing such invasion goes on to say, "Nothing in this paragraph contained shall create any legal or equitable rights in any beneficiary or any other person."

All such provisions are wholly inconsistent with the concept that the beneficiaries are to have any control at all over the man-

agement of the trust estate. As pointed out in *Loud v. Union Trust Co.*, supra, the whole idea of a spendthrift trust is to substitute the judgment of the trustee for that of the beneficiary.

It is true that Marcellus expressed a hope that the paper would be continued as a family institution. Yet in giving directions to his trustee he employed only precatory language, both as to retention of Eagle stock and its disposition:

"In depositing hereunder an interest in the newspaper known as the Wichita Eagle, the Donor *expects* that this interest in this family owned institution will be retained in the trust until such time as the family may dispose of the property, in which event the Donor *desires* that the Trustees hereunder join with the other members of the family and dispose of the interest in the property which may be held under the terms hereof at such time." (Emphasis added.)

The language employed, appearing in substance in both the trust and the will, reflects Marcellus' realization that his family—including his collateral relatives—might well decide to dispose of the paper before the trusts ended. (In fact, the paper was sold in the spring of 1973.) We cannot read his intention to create a "present interest" in his beneficiaries in 1941 or his "expectation" that the paper might be retained in the family as overriding the express provisions of both instruments conferring the broadest possible discretionary powers on the trustee.

We think, therefore, that plaintiffs misconceived their position when they made their original demands as "owners" of the stock held in their trusts. It is true that the *inter vivos* trust would terminate two years after Marcellus' death, but the testamentary trusts would go on for fifteen years. Under either document the income beneficiaries would receive the corpus of their respective trusts only if living on the termination date. Alternative dispositions were made in case of death, and contingent beneficiaries were named. The uncertainties of life in our society being what they are, none of the beneficiaries could be assured that they would ever be "owners" of any trust assets until the trusts terminated.

If the beneficiaries could not, as "owners," control the trustee's discretion in voting, were they entitled to enjoin its proposed vote as an abuse of discretion? They place heavy reliance on the pretrial order of the administrative judge, directing that as to the *inter vivos* trust the stock "shall be voted in each individual trust for the best interests of the beneficary of such individual trust." The same concept was incorporated into an order by the trial judge dealing with the stock in the estate.

They interpret "for the best interests of the beneficiary" to mean "as the beneficiary wishes." That, as we have seen, misconceives the respective roles of trustee and beneficiary under a spendthrift trust. Marcellus could, of course, have provided that the beneficiaries' personal wishes should control; but he did not. By the same token he could have made the *inter vivos* trust terminate on his death and given the beneficiaries immediate control of the stock; again he did not. The whole purpose of a trust is to put control of the corpus in the trustee, and not in the beneficiaries.

There can be no quarrel with the pre-trial order below requiring the stock in each trust to be voted in the "best interests" of each beneficiary. But, as was so aptly pointed out in *First Nat. Bank of Birmingham v. Ingalls,* supra, "[i]t was the duty of the bank to determine in its best judgment what was for the best interest of the trust estate in all its aspects rather than what one beneficiary might conceive to be his personal interest." (257 Ala. at 545.)

Here, as in the Ingalls cases, the chief asset of each trust was stock in a large, closely held corporation. It was in the best interests of each beneficiary, *as a beneficiary,* that the corporation prosper, so that the stock might grow in value and the company might pay dividends. Anything promoting this end was in the best interests of each beneficiary; anything detracting from it was contrary to the best interests of each beneficiary. Regardless of what they conceived to be their personal interests, *as beneficiaries* all the objects of Marcellus' bounty were united in interest. Hence we find inapplicable K. S. A. 1975 Supp. 58-1205 (*b*), which deals with situations where a trustee's duties with respect to one trust conflict with duties owed to another.

The bank appears to have recognized this fact throughout. Asked at trial why the trust committee "arrived at a consensus opinion of what was best for all beneficiaries instead of what was best for the beneficiary of a specific trust," the bank's representative replied:

> "We are still of the opinion that what is best for all is likewise of benefit to each specific trust and each specific beneficiary."

As previously recited, when Mr. Kitch attacked the current management of the paper in his letter of October 28, 1970, the bank through its president made a study of the paper's condition and concluded that it was making more than satisfactory progress. While it remained receptive to suggestions for improvement, the bank took the position that such suggestions should be specific

before it would vote to alter the status quo. Whether the bank's conclusions as to the financial position of the paper were right or wrong is immaterial. The important point is that it took steps to make an informed and independent decision as to what course was best for the paper, and therefore for each trust and each beneficiary. It thereby fulfilled both the spirit and the letter of its fiduciary obligation.

We therefore hold that the trial court erred in enjoining the voting of stock held by the bank, and in requiring it to vote as requested by the beneficiaries. It was authorized and required by the trust instruments to vote the stock in its discretion. The trial court should not have interfered with that discretion without a showing of an abuse which would result in injury to one or more of the trusts. No such showing was made.

What has been said largely disposes of the plaintiff-appellants' arguments that the trial court should have removed the trustee for breaches of trust "implicit in the Court's findings." Whether a trustee should be removed is a question addressed to the sound discretion of the trial court. K. S. A. 1975 Supp. 59-1711; *In re Estate of Osborn*, 179 Kan. 365, 295 P. 2d 615; *Achenbach v. Baker*, 151 Kan. 827, 101 P. 2d 937; 90 C. J. S., *Trusts*, § 231.b; Scott on Trusts, § 107.

As was said in *Ingalls v. Ingalls*, supra, "[t]he removal of a trustee is a drastic action which should only be taken when the estate is actually endangered and intervention is necessary to save trust property. Further, "[t]his is especially true where the trustee is named by the settlor." In addition to the authorities cited in *Ingalls*, see, *Beichner Estate*, 432 Pa. 150, 247 A. 2d 779; *Sternberg v. St. Louis Union Trust Co.*, 163 F. 2d 714 (8th Cir. 1947), cert. den. 332 U. S. 843, 92 L. Ed. 414, 68 S. Ct. 267; *Hartt v. Hartt*, 75 Wyo. 305, 295 P. 2d 985.

This was the standard adopted by the trial court in its conclusion of law No. 13: "The removal of a trustee is a drastic action which should only be taken when the estate is actually endangered and intervention is necessary to save trust property. Such is not the instant case and the trustee has not breached its duties in such a way as to warrant removal." In their brief before us the plaintiffs concede that "[a]pplying these standards we would have to agree that this Court should not attempt to override the discretion of the trial court." Their whole argument is that the

standard is wrong, and therefore this court should exercise its own discretion independently of the action of the trial court. This we cannot do. The trial court applied the correct standard. Even though it found a breach of duty in the trustee's voting proposal (which this court finds erroneous) it nevertheless refused to remove it. We cannot find an abuse of the trial court's discretion in so holding.

Other claims of breach of trust urged upon us we find even less substantial. *E. g.*: (1) As explained above, the voting proposal violated neither the terms of the trust nor the court's order that the trustee vote the stock in each trust in the best interests of each respective beneficiary. (2) A letter to all beneficiaries and their counsel advising them of the bank's intention to vote for existing management was also sent "blind" to the officers, directors and shareholders of the paper. We are unable to attribute any sinister motive to this procedure or find any breach of trust. Management had a legitimate interest in knowing whether upheavals were ahead, and the smooth operation of the paper was in the interest of all trusts. The trial court went no further than to require that future "outside" contacts of a like nature be made known to the beneficiaries. There was no abuse of discretion in refusing to impose more severe sanctions. (3) The bank continued to carry the paper's commercial account, as it had during Marcellus' lifetime. Any "conflict of interest" from this routine relationship was minimal; there was no trafficking in the assets of the trusts as there was in the cases cited by plaintiffs. Further, the situation was certainly contemplated when Marcellus drew the trust in 1941 and the will in 1966. Conflicts known to the settlor when he names the trustee are generally regarded as not affording grounds for removal. See Scott on Trusts, § 107.1; Restatement of Trusts, Second, § 107, comment *f; Shelton v. McHaney,* 343 Mo. 119, 119 S. W. 2d 951; *Rosencrans v. Fry,* 12 N. J. 88, 95 A. 2d 905. The trial court, in its conclusion No. 12, saw a potential for conflict but not enough to warrant removal. We cannot say this decision amounted to an abuse of discretion. In addition, even if this ground had been good it is now moot, since the trusts no longer own any stock in the paper and the bank no longer has the paper's account.

A word needs to be said about efforts to sell the newspaper. Plaintiffs contend that the bank violated its alleged duty to keep the paper in the family by neglecting to restrain its co-trustee Marsh from his sales efforts, and by urging a sale of the paper. There is

no doubt that after Marcellus' death Marsh was anxious to sell—
and he was not alone. Victor Delano, in fact, solicited and in
March, 1971, received a firm offer from a newspaper chain to buy
the paper for $24,200,000 in cash, stock and notes. This offer was
communicated to all stockholders, including the bank. Marsh
urged acceptance. The bank relayed the offer to all beneficiaries
without recommendation and polled them as to their views. Upon
meeting objections, the bank refused the offer.

There were, in fact, many negotiations for sale of varying degrees
of seriousness. Britt Brown testified that in 1962 Marcellus him-
self had solicited three offers for the paper, all of which were placed
in the minutes of the corporation and rejected. Since Marcellus'
death Brown had received at least three unsolicited inquiries from
newspaper chains. Representatives of newspaper chains apparently
put out feelers at every publisher's convention. Mr. Kitch, plaintiffs'
counsel, indicated by questions asked in a deposition in January,
1971, that he himself had already ascertained by "an exposure of
this property for sale" that $12,000,000 would be a top price for the
paper, and had so informed his clients. (This was some two months
before the $24,200,000 offer secured by Delano.)

We are, frankly, unable to see how the bank's participation—if it
can be called that—in these activities constituted a breach of trust.
The paper was a prime target for chain acquisition and offers and
negotiations were in the air, so to speak. The bank would have
been hard pressed to have stopped them even if it had felt obliged
to do so. The fact remains that the record does not show that the
bank initiated any negotiations or that it urged a sale. The most it
did was to relay to the beneficiaries the one firm offer made to it,
and it would have been derelict in its duty had it not done so.

In short, even if this court were now faced with the task of deter-
mining *de novo* whether the bank should be removed as trustee we
could find no grounds for doing so.

The plaintiffs' claim that the bank should be individually liable
for their attorney fees is disposed of by our holdings above. The
trial court on this issue found:

"After examining the briefs of counsel, it is the finding of the Court that
the First National Bank in Wichita, Trustee, did act as Trustee for many years
without complaint from any of the parties to the trust and that upon com-
plaint the Trustee did seek legal advice from a reputable law firm. In accord-
ance with said advice the Trustee continued to maintain the trust and no evi-
dence was presented at the trial which warranted removal of the Trustee for
breach of its duty. Different avenues of approach were certainly open to the

Trustee but its choice of action was not so arbitrary and capricious as to warrant a surcharge of fees against it. The matter of surcharge is a drastic remedy and should only be applied when there has been a willful disregard of trust duties and [this] certainly was not the case in the instant action. The petitioners' motion for surcharge is overruled."

Surcharge is a remedy designed to make the trust estate whole, primarily where losses have been incurred through the negligence or bad faith of the trustee. Scott on Trusts, §§ 201-205; 90 C. J. S., *Trusts*, § 393. Here, first of all, there was no breach of trust. Secondly, no loss to the assets of the estate is alleged; appellants seek only to recover their attorney fees. Surcharge is thus inappropriate since, even if a breach is committed, a trustee "is not subject to a surcharge for a breach of trust which results in no loss." (Scott on Trusts, § 205.) Moreover, attorney fees are not generally allowed unless authorized by statute (*In re Estate of Murdock*, supra, Syl. para. 7), and have been denied under similar circumstances. See, *Moser v. Keller*, 303 S. W. 2d 135 (Mo. 1957); *Wanamaker's Trust Estate*, 340 Pa. 419, 17 A. 2d 380; *Gavin v. Miller*, 222 Ind. 459, 54 N. E. 2d 277.

Our holding on the primary issue also disposes of the beneficiaries' claim that the trustee should have been denied its compensation and expenses. The trustee is entitled to an allowance for those items under K. S. A. 59-1717 and under the express terms of both the *inter vivos* trust and the will. See, *Parsons v. Smith, Trustee*, 190 Kan. 569, 376 P. 2d 899; *In re Estate of Gustafson*, supra; *Henshie v. McPherson & Citizens State Bank*, supra.

In *Murdock I* we disposed of the question of the executor's expenses in that case, directing a remand for determination by the probate court. We specifically said that "the executor properly appeared throughout in defense of the estate." (213 Kan. at 853.) In this case the bank successfully defended itself against plaintiffs' efforts to have it removed as trustee of plaintiffs' trusts under both instruments. It is entitled to its expenses in making such a defense. *Ingalls v. Hare*, 266 Ala. 221, 96 So. 2d 266; *In re Trust Created Under Will of Freeman*, 247 Minn. 50, 75 N. W. 2d 906; 90 C. J. S., *Trusts*, § 284.

The allocation of those expenses presents another problem. Plaintiffs repeatedly disavowed any attempt to remove the bank as trustee for Marsh Murdock or Victoria Bloom, and as noted above, Marsh and Victoria were not allowed to participate in the trial below. Victoria has nevertheless been required to appear as an appellee in

this court to urge that no part of the expenses of litigation in this case be assessed to her trust's share of the residuary estate. We think she is right in her position, and that neither her share nor that of Marsh Murdock is properly chargeable with such expenses. Counsel for plaintiffs conceded as much on oral argument. Although the record is somewhat unclear on this issue, we read the trial court's orders as achieving this result.

A related issue is the right of plaintiffs to have their own attorney fees paid out of their respective trusts. The bank urges that such an allowance would defeat the spendthrift provisions of the trust, and is not authorized by statute. While the argument has much merit, the court has concluded such fees are allowable.

In *Murdock I,* we disallowed attorney fees for those prosecuting and defending the widow's claim against this estate (except the executor), but we did recognize:

"In a meritorious action brought to construe a will, attorney fees are allowable under the provisions of K. S. A. 59-1504 as costs of litigation where the services of the attorney have been beneficial to the estate or are necessary for proper consideration of the will." (*In re Estate of Murdock,* supra, Syl. para. 8.)

In this case the initial petitions revealed a controversy over the parties' respective rights and duties under the will. The defendants' response to the first petition asserted that it "involves construction of the Last Will and Testament of decedent" as well as the *inter vivos* trust instrument. By way of counterclaim Marsh and the bank requested "the advice and instruction of the Court as to the duties and rights of the parties under the Will and *inter vivos* trust instrument." The primary issue litigated was where discretion was vested under the instruments. This involved construing the instruments—including the will—and would seem to come under the rule recognized in *Murdock I,* quoted above. It is true that plaintiffs hoped to reap personal benefit from their suit, but that does not mean that the construction of the instrument conferred no benefit on their respective trusts. See, *In re Estate of Showers,* 207 Kan. 268, 485 P. 2d 299; *Singer v. Taylor,* 91 Kan. 190, 137 Pac. 931. Here, the action has settled the respective roles of the trustee and beneficiaries, and for such benefit the plaintiffs should be allowed their fees, payable out of their respective trusts or share of the estate.

Finally, the bank urges on its cross-appeal that the trial court erred in holding that it held the estate shares as trustee rather than as executor. In view of our holding that the bank should not in any

event have been required to vote the shares except as dictated by its own sound discretion, this issue may seem moot. In fact, the main issue in this case has to some extent become moot, through the passage of time and through the results which flowed from the order below. The *inter vivos* trust terminated by its terms in 1972, and the assets were distributed to the beneficiaries. Under the decree below the bank voted the estate shares allocated to plaintiffs for their nominees. Plaintiffs, in conjunction with Britt Brown, thereby acquired control of the paper and by early 1973 they had sold it. The bank joined in the sale and therefore no longer holds any Eagle stock. Hence the right to vote that particular stock, the primary issue which precipitated this suit, is no longer a matter of active concern. Nevertheless, that issue will govern the future administration of the trusts, and is clearly relevant to the issues of removal, surcharge, and the trustee's compensation and expenses, and for that reason had to be decided.

As to whether the bank held the estate shares as executor or trustee, the trial court's actual holding is unclear. Its order on the primary issue of voting power, however, assumed that the estate shares were subject to the trust provisions of the will. (By extension they were held to be also subject to the provisions of the *inter vivos* trust.) As a subsidiary of the main issue this question likewise bears on the issues of removal, surcharge, etc., and likewise requires determination.

When the same person is named executor and trustee it is often difficult to determine when the fiduciary shifts roles. As one observer noted, "it invariably [takes] place in the dead hours of the night." Birrell, The Duties and Liabilities of Trustees 13 (1896). Despite fine distinctions made, the general rule is:

". . . The normal orderly procedure would seem to be that the executor account and be discharged, and that thereafter the same party qualify as trustee and begin the trust administration. This would make the break between administration as executor and as trustee distinct. But in many cases the trust property consists of a part only of the estate, or for other reason it is desirable to set up the trust before the estate accounting. It should be possible for the executor to cease to hold given property as such and to begin his administration of it as trust property, if the intent to bring about this effect is clearly indicated in any way. Something more, however, than a mere mental decision by the executor-trustee should be required. He should in some unequivocal way set apart and mark the trust res." (Bogert, Trusts & Trustees, 2d Ed., § 583 at 229-30.)

See also, *In re Warren's Estate*, 74 Ariz. 319, 248 P. 2d 873; *Jones v.*

*Broadbent,* 21 Idaho 555, 123 Pac. 476; *Monk v. Everett,* 277 Mass. 65, 177 N. E. 797; *In re Schield's Estate,* 250 S. W. 2d 151 (Mo. 1952).

Under Marcellus' will, the "rest, residue and remainder" of his estate was left to the trustees. The rationale of the general rule is apparent: it is impossible to determine the amount of a residuary estate until the liabilities of the estate are determined. One of the prerequisites of a trust is, of course, a definite corpus. *Shumway v. Shumway,* 141 Kan. 835, 44 P. 2d 247.

That determination was unduly complicated in this estate by the questions resolved in *Murdock I;* the size of the residuary estate could not be determined until the executor knew whether Paula would take one-fifth, one-half, or nothing. Indeed the trial court recognized the dilemma in ruling on a related matter:

". . . The assets of the trust created in the above-referenced estate have not been finally determined and until the said assets have been determined the administration of the separate and individual trusts is hampered. The main issue before the Court and the only one to which this matter is being directed is whether or not the Executor failed in its duties to apply to this Court to proceed with litigation in the Federal Court. By reason of the fact that the trusts have not been definitely ascertained and by reason of the fact that the Executor has a duty to amass assets in the estate, the bank was acting properly and with the advice of its counsel in proceeding to ask directions from the Probate Court. When the matters in the trust have been finally determined, then each trust is to be separately administered and any disputes insofar as the separate trusts are concerned are to be brought to this Court for directions."

Within slightly over a month after our opinion in *Murdock I,* the bank filed a petition for qualification as trustee and on April 8, 1974, less than three months after *Murdock I,* the probate court ordered the trusts partially funded. We fail to see how the transfer could have occurred much sooner.

Appellant beneficiaries misread K. S. A. 1975 Supp. 58-904 as establishing the assets of the trusts at the date of death. Subsection (*a*) of that statute provides:

"(*a*) An income beneficiary is entitled to income from the date specified in the trust instrument, or, if none is specified, from the date an asset becomes subject to the trust. In the case of an asset becoming subject to a trust by reason of a will, it becomes subject to the trust as of the date of the death of the testator even though there is an intervening period of administration of the testator's estate."

Thus the trust arises *for income purposes* at the date of death. That does not mean that during the period of administration the asset itself is held by the trustee as such. The clear implication of

the statute is that the matter is one of bookkeeping until the estate is actually settled. It is in accord with the general principle that assets remain in the probate estate until the residue is determined and a transfer to the trustee effected. See, *Phair v. Federal Deposit Ins. Corporation,* 74 F. Supp. 693 (D. N. J. 1947).

*Matter of Bird,* 241 N. Y. 184, 149 N. E. 827, relied on by plaintiffs, is not contrary to our views on this issue. That was a dispute between life tenants and remaindermen, the question being whether an extraordinary dividend declared during the period of administration should go to income or principal. The court held it was income, applying the general rule (reflected in our statute). In so holding, however, the court recognized that where a residuary estate is to be appraised and divided in kind the trusts so determined would come into being only after the division was made, citing *United States Trust Co. v. Heye,* 224 N. Y. 242, 120 N. E. 645.

Here we think it significant that under the will (as under the trust) the trustees were not necessarily required to allocate any Eagle stock to any one of the trusts. Under Article Third of the will Marcellus provided that "[m]y trustees shall divide the trust property into equal separate shares. . . ." Under paragraph (g) he further provided that "[i]n making distribution in property the Trustees shall not be required to distribute to any beneficiary an aliquot part of any security or property comprising the trust estate at the time of distribution, and the judgment of the trustees as to what shall constitute a proper division among them, and their selection and valuation shall be binding and conclusive upon all beneficiaries hereunder."

Thus it was theoretically possible for one or more of the trusts to have no Eagle stock at all. Such a result was, of course, not practical because of valuation problems, coupled with the fact that the Eagle stock constituted the bulk of the estate. Ease of administration, if nothing else, would dictate a pro rata division of the estate's chief asset when the time came. Nevertheless, the possibility points up the fallacy involved in saying that the Eagle stock passed into the trusts immediately upon the death of Marcellus, and even more the error involved in saying that the beneficiaries became "owners" of any Eagle stock by virtue of his death.

We therefore conclude on this issue that even though the beneficiaries may have become entitled to income from the Eagle stock upon the death of Marcellus, until the residuary estate was deter-

mined and the trusts were funded the bank held the stock in its capacity as executor rather than as trustee.

In accordance with what has been said, the judgment below is affirmed (a) insofar as it refused to remove or surcharge the trustee; (b) insofar as it determined that all parties should be allowed fees and expenses; and (c) in its allocation of those fees and expenses. It is reversed insofar as it required the trustee to comply with the dictates of the beneficiaries, and insofar as it held (at least by implication) that title to any Eagle stock passed from the bank as executor to the bank as trustee before the testamentary trusts were funded.

APPROVED BY THE COURT.

SCHROEDER, J., dissenting: I must respectfully dissent from that portion of the opinion which approves the award of attorney fees in the amount of $210,000 to the appellant beneficiaries. While the majority properly sets out the general rule that recovery from the estate is permitted where a benefit has been conferred on the estate, the record clearly discloses the *sole motive* behind this litigation initiated by the appellants is personal.

The trusts documents, analyzed from their four corners, leave no necessity for construction. In the midst of "sole" and "absolute" powers vested in the trustee, appellants focus on the minor "present interest" phrase and assert ambiguity; that construction in view of these well prepared trust documents is unreasonable as the majority concluded.

Even a cursory reading of the massive record in this case reveals the appellants' sole motivation and purpose in pursuing their construction was to gain control of the management of the newspaper. Mr. John Eberhardt, a respected Wichita attorney unconnected with this litigation, testified that "however you label that action, [it] involved basically the control of probably the most desirable thing in Sedgwick County to control, the newspaper." However well qualified appellants' candidates may have been, the appellants' purpose was in direct conflict with the purposes of Marcellus Murdock who placed his confidence in the Bank. The anticipated advantage sought by the appellants can only be characterized as personal.

Our longstanding rule is that no attorney fees will be chargeable against an estate when the object of the litigation is purely for the

personal benefit of the litigant. In *Householter v. Householter,* 160 Kan. 614, 164 P. 2d 101, the court said:

". . . Counsel for the appellant contend that the district court should have allowed them attorneys' fees even though they represented the unsuccessful party in the case. They assert that the sole question to be decided is the proper construction of a will and that without a decision on such question, the appellees would have been unable to perfect title to the involved real estate. In support of their contention they cite *Singer v. Taylor,* 91 Kan. 190, 137 Pac. 931, and other cases. In the present case, however, the appellant sought the recovery of a specific interest in described land. The appellees were forced involuntarily to uphold a will which did not appear on its face to be ambiguous. No estate or trust fund was benefited by the litigation. From a standpoint of construction and equity there appears to be no more reason why the appellees should pay attorneys' fees to counsel for appellant. . . . The appellant sought to recover for his personal benefit—not for the benefit of all parties incidentally concerned with the litigation. In such cases attorneys' fees ordinarily are not properly allowed to counsel for the unsuccessful party. (See *Bartlett v. Mutual Ben. Life Ins. Co.,* 358 Ill. 452, 193 N. E. 501, and annotation in 142 A. L. R. 1459.) . . ." (pp. 619, 620.)

In the case of *In re Estate of Reynolds,* 176 Kan. 254, 270 P. 2d 229, the court said:

"The opinion *In re Estate of Reynolds,* 173 Kan. 102, 244 P. 2d 234, makes it clear that the portion of the will which counsel for Bertha J. Blue sought to have construed needed no construction. The language is clear. The efforts of her attorneys were for her own benefit. The trial court obviously was of the opinion that such services were not helpful in the administration of the estate and that there was no reason why the estate should have to pay it. . . . " (p. 258.)

Here the appellants have failed on each substantive point raised in this litigation—"construction" of the trust, surcharge and removal. Aside from any lack of benefit to the estate, the unsuccessful outcome of the litigation on the facts in this case suggests that attorney fees should not be paid out of the trust estate. See, Annot., 9 A. L. R. 2d 1132, 1236 [1950].)

It is respectfully submitted the trial court erred in awarding counsel fees as to the appellants.

FROMME and MILLER, JJ., join in the foregoing dissent.