# Wytheville

GILPIN WILLSON, SR. v. WILLIAM G. KABLE, II, ET ALS.

June 9, 1941.

Record No. 2370.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Spratley, JJ.

*J. M. Perry, R. Gray Williams* and *J. Sloan Kuyken-dall,* for the appellant.

*Joseph I. Nachman,* for the appellees.

GREGORY, J., delivered the opinion of the court.

The entire capital stock of the Staunton Military Academy was owned by Captain William H. Kable. He acquired it in 1894 and operated this military school for young men until his death in 1912, when his son, William G. Kable, became the sole owner of the stock of the corporation. He operated the school until his death in 1920.

In 1904 Thomas H. Russell, a man of experience in

military schools, became headmaster of the Staunton Military Academy, and continued with the school until his death in 1933. In 1910 he married Margaret H. Kable, a sister of William G. Kable. She survived him.

William G. Kable, who died in 1920, left surviving him his widow, who has since married Dr. Lawther Whitehead, and three children: Eleanor H. Kable, who became twenty-one years of age June 4, 1933, and who has married one Miller; William H. Kable, who became twenty-one years old on July 10, 1932, and who has changed his name to William G. Kable, II; and Helene H. Kable, who became twenty-one years old August 19, 1935.

William C. Rowland, of Philadelphia, was a manufacturer of military uniforms and a warm friend of the Kables. He sold to the school the uniforms needed.

Gilpin Wilson, Sr., a resident of Staunton, was also a friend of the Kables. He was connected with the school from 1894 in the capacity of director and remained in that capacity until his resignation in 1937. He served as president from 1933 until 1937. He was a business man and operated a drug store in Staunton with his brother. He was also vice-president of Staunton's largest bank.

At the time of the death of William G. Kable on June 4, 1920, he owned the entire capital stock of the corporation. He left a will and bequeathed the entire stock to five trustees. They were his widow, Eleanor, Thomas H. Russell, Gilpin Willson, William C. Rowland, and W. H. Steele, and their successors. The stock was to be held by the trustees for the benefit of the widow and children. These trustees were directed to continue the school and for that purpose to vote the stock. They were authorized to elect themselves as officers and directors of the corporation and to employ Thomas Russell as principal of the school as long as he lived at a salary of not more than $10,000 a year. The trustees were each to receive $200 a year for their services.

The net income from the school was to go to the widow during her life, or until one or more of the children attained the age of twenty-one years, upon which event such child would receive a one-ninth part of the income. Upon the death of the widow, the trustees were to hold the estate for the benefit of the testator's children until the males became twenty-five years of age or the females became twenty-two years of age. At that time the estate was to be turned over to the children. The widow, now Mrs. Whitehead, still survives, and therefore the trust continues.

The widow was given the power to nominate trustees in case one or more of them died or removed from the State.

The testator appointed Thomas H. Russell, Gilpin Willson, and William C. Rowland as his executors. They have long since settled their accounts as executors after satisfactorily administering the estate.

A short time after the will was probated Gilpin Willson, Thomas H. Russell, T. G. Russell (a brother), W. H. Steele, and W. C. Rowland were elected directors of the corporation. Thomas Russell was elected president, Willson, vice-president, and Steele, treasurer. An executive committee of Willson, Thomas Russell, and Steele was named to conduct the affairs of the school between meetings of the board.

In 1923 Mrs. Kable was elected director in the place of T. G. Russell. Dr. Whitehead, whom Mrs. Kable had married in 1927, was elected a director in 1933. He served one year and declined re-election. William A. Pratt was elected in his place. Steele was not re-elected director in 1936, but was re-elected in 1937.

William A. Pratt had also been appointed a trustee succeeding Thomas Russell, who died in 1933. Upon Pratt's death in 1937, Mrs. Whitehead nominated S. D. Timberlake, Jr., in his place.

In 1920 the executors instituted a friendly suit against the trustees in order to obtain the aid of the court in

the administration of the estate. The purpose of the suit, insofar as the executors were concerned, had ended, but the cause was retained on the docket.

In 1920, at the death of Kable, the financial affairs of the school were in poor condition. The corporation owed $362,000, and had no prospect of paying it, but by great effort on the part of the directors and by excellent and intelligent management the debts were paid. Some $250,000 of net income has been paid Mrs. Whitehead and the other beneficiaries, and some $510,000 has been added to the physical properties of the school. Mrs. Whitehead and others interested in the school have attributed the financial success largely to the efforts of Gilpin Willson. The record shows that he was untiring in his efforts and that he has rendered faithful and valuable services to the school. Under his leadership and by the exercise of his good business judgment the school has prospered.

Rowland began to sell uniforms to the school in 1905. Thomas Russell had an agreement with him and the Kables dating back to Russell's first connection with the school, whereby Rowland would pay Russell six per cent on sales of uniforms to the cadets. This six per cent was paid to Russell from 1908 to 1933, the date of his death.

Willson testified in this case that the agreement between Russell and Rowland was approved by both of the Kables during their lives; that William G. Kable expressed the desire that it be continued; and that all of the directors knew of it. This testimony, so far as an exhaustive examination of the voluminous evidence in the case discloses, was not contradicted by any witness. We cannot find that Steel contradicted it, though he testified at length.

The sale of uniforms to the students was a very substantial part of the business of the school. In sixteen years a profit of $330,000 was realized. Willson thought it good business to continue the contract with Rowland

for the purchase of uniforms because the academy was making so much profit through it, and at the same time getting at a reasonable price uniforms that were satisfactory.

After Russell's death in 1933, friction resulted between Rowland and Steele.

On June 25, 1937, William G. Kable, II, filed a petition against Gilpin Willson in the old executors' suit in which he made ten separate charges of fraud and mismanagement against Willson in connection with the trust estate and the conduct of the school. He later filed an amended petition adding to those charges already made many others. The trial court held that all but three of the charges were unfounded. The sixth, ninth, and tenth charges were upheld.

The sixth charge was that Gilpin Willson knew of a *secret* agreement adverse to the financial interest of the school between Russell and Rowland whereby Rowland paid six per cent commissions to Russell on all uniforms sold to the cadets.

The ninth charge was that Willson had by gross neglect permitted A. T. Cooksey, a teacher, to have credit to the extent of $150, which has never been paid, and that Willson should be held liable for that amount.

The tenth charge was that Willson had permitted the executive committee in 1920 to purchase a $50,000 policy of insurance on the life of Thomas Russell, $40,000 of which was for the benefit of the school and $10,000 for the benefit of Mrs. Russell. The court held that Willson should be held for twenty per cent of the premiums paid.

From our view of the case it will be unnecessary to discuss the pleadings.

A petition had already been filed against Rowland by Kable, II. It was prosecuted through this court under the style of *William C. Rowland* v. *W. H. Kable, et als.*, and is reported in 174 Va. 343, 6 S. E. (2d) 633. This court, upon the evidence in that case, held that Rowland was guilty of a breach of trust in dealing with the trust

for his own benefit while he was one of the trustees. He was required to account for the six per cent commission he had paid Russell, and was removed as trustee. His liability has been settled by him.

It is charged in the present case that Gilpin Willson knew of the agreement between Russell and Rowland and that, inasmuch as he made no protest, he was also guilty of a breach of trust and therefore should be removed as trustee. The liability of Rowland having been settled, no recovery against Willson is now sought for any part of the percentage paid Russell. This transaction is injected into this case now for the sole purpose of showing that Willson is unfit to be a trustee.

The question of the removal of Mr. Willson as testamentary trustee is the principal issue in the suit. There are many other matters asserted that we will not undertake specifically to discuss.

Generally, the removal of a trustee is within the reasonable discretion of the court. More is required to remove a trustee appointed by the creator of the trust than is required to remove one appointed by the court. In all cases the real guide is whether or not it is best for the trust estate that the trustee be removed. Friction between the trustee and the beneficiary is not in itself sufficient ground for removal. Some beneficial end must be achieved by the removal or it will not be justified. *Restatement, Trusts*, §107; Bogert, *Trusts and Trustees,* vol. 3, §527.

The evidence in the present suit discloses that all of the directors knew of Rowland's agreement with Russell and that he had a monopoly on the sale of uniforms. The appellee's mother, Mrs. Whitehead, knew of it. There is no denial of this evidence. The evidence in this suit further shows beyond any doubt that Willson never profited in any manner by that agreement, and that the school has not lost anything through Willson.

Russell has been removed as a trustee by death; Rowland by the court. The other trustees and directors,

while they knew of the agreement, have not profited by it.

Cases of this kind must be decided upon their peculiar facts and circumstances. The duties and liabilities of fiduciaries are clearly stated in *Rowland* v. *Kable, supra.* The cases there referred to are numerous. Nothing said here is intended to modify the decision in that case. There Rowland profited; here Willson has not. There the testimony was to the effect that the six per cent commission paid Russell was under a *secret* agreement prejudicial to the school and not known to the other directors and trustees, except Willson; here, the testimony is that all of the directors knew of the percentage paid Russell and that it was no secret.

The directors and trustees, other than Rowland and Willson, have not been proceeded against. The Thomas Russell estate has not been proceeded against, though it was he who received the six per cent commissions. Just why Willson has been singled out is not disclosed. There appears to be considerable feeling against Willson by the appellee, which is disclosed in part by the many admittedly false and unfounded charges made by him against Willson.

We are not unmindful of the rule laid down in *First & Merchants Nat. Bank of Richmond* v. *Bank of Waverly,* 170 Va. 496, 197 S. E. 462, 116 A. L. R. 1156, to the effect that if a co-trustee participates in a breach of trust, or approves or acquiesces in or conceals a breach, or fails to exercise reasonable care, and the like, he is liable jointly and severally for any loss sustained by the trust estate. But here, on this phase of the case, no loss is shown to have been sustained by the trust, and therefore none is sought to be restored. Only a removal of Willson as trustee is desired by the appellee.

What is best for the trust estate? Willson has been connected with the school since 1894, a period of forty-six years. He is a successful merchant and banker. His is an intimate knowledge of the school; its needs and

problems are well known to him. He has observed it when it was at a low financial status, and he has seen it prosper. When the school was in need of money he endorsed paper for it to the extent of $20,000. There is not a particle of evidence tending to show that he is incapable or unfit to act as trustee. There is none that reflects upon his character or tends to show that he is not honest or moral. He has been a great asset to the trust and the school through the many years of his connection. With his experience he will continue to be an asset.

. The many charges of fraud, breach of trust, and gross neglect made by William G. Kable, II, against Willson have not been proven. They must be proven by clear, strong, and cogent evidence. There is no evidence here of any secret agreement between Rowland and Russell whereby the former was to pay the latter six per cent on the sale of uniforms, or that there was any ulterior or corrupt motive which actuated them. The officers and directors knew of the arrangement. It had its inception in the hiring of Russell by the elder Kable in 1905; and with the knowledge and express approval of William H. Kable and William G. Kable this arrangement continued until the death of William G. Kable in 1920.

The facts of this case do not warrant the application of the rule laid down in *First & Merchants Nat. Bank of Richmond* v. *Bank of Waverly, supra,* which states the circumstances under which a trustee is jointly and severally liable for the misconduct, gross neglect, and bad faith of his co-trustee. Willson's knowledge of the Rowland arrangement with Russell, without more, is not sufficient to brand Willson as a violator of his trust. It is not ground for his removal as trustee.

Realizing the lack of evidence in the present case to show any fiduciary misconduct on the part of Willson, Kable, II, at the end of the evidence and not in chief, introduced the entire record of the case of *Rowland* v.

*Kable, supra,* which included the deposition of Willson given in that case. He also introduced the deposition separately. This was done over the objection of counsel for Willson. The evidence in that case was different from the evidence in the present one, though there was no substantial difference in the testimony of Willson. Witnesses testified in that case who did not testify in the present case, among them Mrs. Whitehead. Of course Willson has never had an opportunity to cross-examine the witnesses who testified in the *Rowland Case.* The issue there was the misconduct of Rowland in making secret profits from the trust estate. That is not the issue here. Different parties, different issues and evidence render the deposition and the Rowland record inadmissible. *Winston* v. *Starke,* 12 Gratt. (53 Va.) 317; *Reed & McCormick* v. *Gold,* 102 Va. 37, 45 S. E. 868; *Murray* v. *Moore,* 104 Va. 707, 52 S. E. 381; *Krebs' Ex'rs* v. *Welch's Adm'r,* 111 Va. 432, 69 S. E. 346.

A. T. Cooksey was an instructor at the academy. The treasurer, Steele, advanced Cooksey $200, intending to make deductions from his salary from time to time. At the end of the session Willson instructed Steele to turn the salary check over to Cooksey. Cooksey did not return to school for the following session but made a payment of $50 on the debt, reducing it to $150. Because Willson authorized the extension of credit to Cooksey it is asked that he be adjudged guilty of a breach of his trust. The trial court held him liable for it.

The record does not show where Cooksey is at present or whether or not the account may be collected in the future. However, if Willson exercised erroneous judgment in extending credit of $150 to Cooksey, this would not constitute a breach of trust. In fact, when this transaction is compared with the vast amount of funds supervised by Willson, it is *de minimis.*

The minutes disclose that, at a meeting of the executive committee held on September 27, 1920, it was decided to insure the life of Thomas Russell, the presi-

dent, for $50,000, of which $40,000 was to be payable to the academy. Mrs. Kable (now Mrs. Whitehead), being the principal beneficiary under the will, expressed the wish and desire that twenty per cent of the amount of the policy be made payable to Mrs. Russell, the wife of the president. In accordance with this authority and direction such a policy was procured and the premiums were paid by the academy. Upon the death of Mr. Russell in 1933, $40,000 of the insurance was paid the school and $10,000 paid Mrs. Russell. In the petition filed in the court below Kable, II, charged that this transaction amounted to a diversion of trust funds to the extent of the cost of that part of the policy paid to Mrs. Russell and that Willson, a trustee and director, was liable for the full $10,000, the amount realized from such diversion. The court below held him liable for twenty per cent of the premiums paid for the policy.

Counsel for Willson contend that he should not be held for the $10,000 or any portion of the premium. The minutes of the meeting were recorded in the permanent minute book and it was open to all who were interested.

The premiums were paid by the academy from 1920 to 1933. The transaction was open and above-board and known to the trustees and directors. It was approved by the stockholders at their next meeting. No protest was ever made by any of the trustees or directors. All of the trustees except Rowland actively participated in the meeting at which the purchase of the insurance was authorized.

Mrs. Kable, who was entitled to the net profits of the academy, made the request that twenty per cent of the face of the policy be made payable to Mrs. Russell, who was her sister-in-law.

If the premiums were paid from the net profits of the corporation then they were paid from funds belonging to Mrs. Kable. Of course, there can be no question about that portion of the premiums of the policy set apart for the academy. It had the right to insure Russell's life

for its benefit. We are only concerned with the twenty per cent of the premiums paid by the academy and the $10,000 of insurance paid to Mrs. Russell, who is not a party here. No move has been made to require her to return the $10,000.

Mrs. Kable, being entitled to the net profits, could expend them as she wished. The testator directed the trustees to refrain from "unreasonable expenditures" or "unbusinesslike ventures." They were always to consider the welfare of the corporation, and the school was to be operated so as to increase the business and profits. Under this provision the trustees from time to time used a portion of the income to construct new buildings, adding to the capital investment and putting aside a reserve. The evidence fails to show that the amount used for premiums was taken from the reserve or from capital invested. The burden was upon Kable, II, to prove that they were so taken. This he has failed to do. It certainly would not be presumed, in the absence of proof, that the directors and trustees would permit the premiums to be paid from the reserve or from capital. Besides, the resolution shows on its face that Mrs. Kable was the principal beneficiary under the will and that it was upon her request that the policy was obtained. If the premiums were not to come from the net income, why was it necessary to mention Mrs. Kable as the "principal beneficiary?" Our conclusion is that the premiums were paid from net income that belonged to Mrs. Kable; that she was anxious to obtain the policy for the benefit of the school and her sister-in-law; and that neither the corporation nor the petitioner below is entitled to have the amount or to hold Willson for the $10,000 paid Mrs. Russell. Willson is no more responsible than the other directors and trustees. The trial court erred in holding him liable. The cross-error assigned, directed at this phase of the case, is without merit.

It was charged that Willson was guilty of a

breach of trust in the purchase of securities for the academy and that the drug firm in which he had a substantial interest sold quantities of drugs, paints, and athletic equipment to the school. The trial court held that the purchase of securities and the sale to the academy by the Willson firm of various supplies was not a violation of the duties and obligations of Willson as a director of the corporation or as trustee of the estate. We concur in this holding of the court, which is abundantly supported by the evidence. There is no merit in the cross-assignment of error touching these matters.

The evidence discloses that more than $400,000 was used in the purchase of bonds for the academy and, notwithstanding the adverse condition of the bond market due to the crash of 1929, the school sustained only a small loss. It is now sought to place this loss on Willson. He has not profited in any way or to any extent by the purchase and sale of the bonds and no liability should be found against him for the small loss sustained.

The evidence shows that the articles purchased from Willson's firm were purchased at reasonable prices. No secret or unreasonable profits were made by Willson. In fact, a discount of ten per cent was allowed the academy on its purchases. In *Rowland v. Kable, supra,* it was held that a director could deal with his corporation and sell his property to it so long as the transaction is fair, open, and honest, and the corporation is represented by competent agents. In the case at bar the purchases ran over a period of many years and amounted to many thousands of dollars; they were made by the duly authorized purchasing agent and athletic coaches of the school; the transactions were fair and honest and no exorbitant prices were charged.

Upon the whole record, which is entirely too voluminous, we are of opinion that Willson's conduct has been above reproach and that he has been guilty of no infidelity regarding his duties as trustee of the estate or as

director or officer of the corporation. The evidence fails to justify his removal as trustee.

The decree will be reversed and a final decree will be entered here in favor of Willson, dismissing Kable's petition.

*Reversed and final decree.*