In re A.H. ROBINS COMPANY,
INCORPORATED, Debtor.

Barbara BLUM, Ann E. Samani,
Trustees–Appellants,

v.

UNNAMED CLAIMANTS,
Claimant–Appellee,

Dalkon Shield Claimants Trust,
Party-in-interest,

Official Committee of Equity Security
Holders, Kenneth R. Feinberg; Stephen
A. Saltzburg; Ralph R. Mabey, Examin-
er of the A.H. Robins Company, Inc.,
Amici Curiae.

In re A.H. ROBINS COMPANY,
INCORPORATED, Debtor.

Official Dalkon Shield Claimants'
Committee, Party In
Interest–Appellant,

Unnamed Claimants, Claimant–Appellee,

Official Committee of Equity Security
Holders, Amicus Curiae,

and

Aetna Casualty & Surety Company,
Party In Interest.

In re A.H. ROBINS COMPANY,
INCORPORATED, Debtor.

Barbara BLUM, Ann E. Samani,
Trustees–Appellants,

v.

OFFICIAL COMMITTEE OF EQUITY
SECURITY HOLDERS,
Amicus Curiae,

Georgene M. Vairo, Appellee.

In re A.H. ROBINS COMPANY,
INCORPORATED, Debtor.

Gene LOCKS, Trustee–Appellant,

v.

UNNAMED CLAIMANTS,
Claimant–Appellee,

Official Committee of Equity Security
Holders, Amicus Curiae.

In re A.H. ROBINS COMPANY,
INCORPORATED, Debtor.

Gene LOCKS, Trustee–Appellant,

v.

OFFICIAL COMMITTEE OF EQUITY
SECURITY HOLDERS,
Amicus Curiae,

Georgene M. Vairo, Appellee.

Nos. 88–3219, 88–3221, 88–3223,
88–3224 and 88–3226.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 12, 1989.

Decided June 16, 1989.

Peter B. Edelman (Daniel G. Grove, Carol A. Joffe, Keck, Mahin & Cate, Washington, D.C., on brief), Mark C. Ellenberg, for appellants.

Joseph S. Friedberg, Minneapolis, Minn., (Stephen H. Fredkin, Salinas, Cal., Fredkin & Linker, Guerry R. Thornton, Jr., Atlanta, Ga., William G. Shields, Anderson, Parkerson & Shields, Samuel M. Walker, Jr., Richmond, Va., David M. Dorsen, Sachs, Greenebaum & Tayler, Washington, D.C., on brief), for appellees.

(Robert M. Miller, Berlack, Israels & Liberman, New York City, on brief), for amicus curiae Official Committee of Equity Security Holders.

Before RUSSELL, WIDENER, and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

The appellants, Barbara Blum, Ann Samani and Gene Locks were named as three of the five trustees under the Dalkon Shield Claimants' Trust ("Trust") which was created as a part of the Plan of Reorganization ("Plan") of A.H. Robins ("Robins") under Chapter 11 of the Bankruptcy Code. The Plan also created a Claims Resolution Facility ("CRF") to handle the settlement of claims against Robins resulting from its manufacture and sale of the Dalkon Shield. After hearing twenty hours of testimony in support and opposition of a motion by certain beneficiaries to remove all five trustees, the district court removed the three appellants. We find that the district court's findings of fact are not clearly erroneous, and that these findings, under Virginia law, support the conclusion to remove the three appellants.

I

On August 21, 1985, A.H. Robins, Inc. filed its petition for reorganization pursuant to 11 U.S.C. §§ 101 et seq. Robins sought relief under the Bankruptcy Code because of its cash flow problems resulting from the cost of defending, litigating and paying thousands of claims brought against it by persons claiming damage from use of the Dalkon Shield. During the bankruptcy, notice was given to claimants throughout the world that they must file claims in the bankruptcy proceeding, or their claims against Robins resulting from its manufacture and distribution of the Dalkon Shield would be barred. As a result, several hundred thousand claims were filed. In order to keep records of these claims, the district court, which had retained jurisdiction over a number of questions and issues in the bankruptcy, created a record keeping and computer center under the management of the Clerk of the Bankruptcy Court for the Eastern District of Virginia. This facility employed approximately 20 people, and it became the repository of the information relating to claimants. It was an indispensable storehouse of information necessary to the eventual resolution of all claims.

After months of negotiations, a Sixth Amended and Restated Plan of Reorganization of A.H. Robins, Inc. was agreed upon and was submitted to all claimants and approved by an overwhelming majority of claimants in both number and amount. This plan called for the merger of Robins into a subsidiary of American Home Products, and the creation of a Claims Resolution Facility, a Claimants' Trust and the Other Claimants' Trust for the purpose of resolving and satisfying all claims brought against Robins as a result of the Dalkon Shield. All claims arising from the Dalkon Shield would be made against the Trusts and none of them would follow Robins after the merger.

The Plan provided for the appointment of five trustees and Barbara B. Blum, Kenneth R. Feinberg, Gene Locks, Stephen A. Saltzburg and Ann Samani were appointed and duly qualified. The Trust is to be funded in the amount of $2.3 billion. This amount will not be paid into the Trust until the Plan has been confirmed by the court

and all appeals challenging the Plan have been exhausted.

In March 1988, each of the five trustees were informed that they would be selected. The selection of trustees was made by the court upon recommendation of the Claimants' Committee. On April 11, 1988 the court entered an order appointing the five trustees and on May 5, 1988 the court met with the trustees and tried to impress upon them the tremendous responsibility of handling such a large number of claims and such an enormous trust fund. He advised that he wanted them to "hit the ground running". The court was anxious to promptly pay the liquidated claims of persons who had obtained judgments against Robins prior to the bankruptcy and to pay settlements that had been agreed upon prior to the bankruptcy. Interest on these claims was running as of January 1, 1988.

On July 25, 1988, the day that the confirmation order was entered approving the plan of reorganization, the district judge and the bankruptcy judge met with the five trustees and reiterated the necessity for handling the claims expeditiously. The trustees were also advised that this was a public trust, one of the largest ever created in the United States, and that the court had a role to play to be sure that valid claims were promptly paid.

Under § 3.03(c) of the Trust, it is provided:

A trustee may be removed from office by the Court upon its own motion, the motion of any Trustee, or the motion of at least 100 Beneficiaries represented by at least five independent and unaffiliated attorneys and a determination by the court that such removal is appropriate upon good cause shown.

On September 24, 1988 a motion was made to remove the trustees for the Dalkon Shield Claimants' Trust and the Dalkon Shield Claims Resolution Facility. This motion was filed by five unaffiliated independent attorneys representing more than 1,800 Dalkon Shield personal injury claimants. Thereafter, an additional 1,101 Dalkon Shield personal injury claimants intervened in support of the motion, and at the trial more than 300 additional claimants, through their attorneys, were permitted to participate in the removal proceeding. The petition for removal of the trustees alleged in part that the trustees "are guilty of malfeasance, or at least misfeasance in the performance of their duties as set forth in the Claimants' Trust Agreement." In particular the moving parties are informed and believe that these acts consist of the following:

(1) The trustees have negligently failed to act prudently and expeditiously in setting up the Claims Resolution Facility.

(2) The trustees sought the employment of a managing consultant firm to advise them as to the deployment of the Claims Resolution Facility, which is a task they should be able to handle themselves without such assistance, if they have the requisite ability and background to justify their appointment as trustees. Such a request, in the opinion of the moving parties, underscores the trustees' apparent lack of ability and skill required to administer this trust fund.

(3) The trustees are opposed to having their activities supervised by this court for the protection of the Dalkon Shield claimants.

(4) The trustees voted to appoint Murray Drabkin, and his law firm as legal representative of the Dalkon Shield Trust Fund. The moving parties are informed and believe that some or all of the trustees have had long and close relationships with Mr. Drabkin, that such prior relationships improperly influenced the trustees to consent to Mr. Drabkin's appointment as attorney for the trust fund that Mr. Drabkin and his firm have an inherent conflict of interest which precludes their legal representation of the fund, and that this act demonstrates that the trustees are not acting prudently in the best and sole interests of the Dalkon Shield claimants, and

(5) Other acts of misfeasance and improprieties which have been disclosed by Mr. Mabey's investigation and report to this court.

A trial on the issue of whether the trustees should be removed was commenced on October 31, 1988 and twenty hours of testimony was taken. On November 28, 1988, the district court filed its Order and Memorandum removing appellants Blum, Locks and Samani as trustees, and retaining trustees Feinberg and Saltzburg. The district court set forth findings of fact in its memorandum, but did not number them. We have supplied numbers for easier reference.

1. Notwithstanding the Trust Agreement's mandate, emphasized by the Court, to effect a speedy resolution of Dalkon Shield Claims, the Trustees failed to act effectively toward the creation of an operational claims resolution process. This failure to act was a direct result, at least in part, of conflict between the Trustees and a perceived but misguided one-sided conflict with the Court on the part of three Trustees.

2. The Court in its findings and conclusions does not treat Locks' and Samani's challenge to the Court's authority as the basis for the removal of any of the Trustees, it is the derelictions following that challenge which requires the Court to act. The open defiance of these Trustees, however, cannot be overlooked. The facts are that the excessive time expended by the dissidents in arguing and discussing ways to challenge the Court's continuing supervisory role has resulted in costly delay in effecting the Trust's purposes.

3. Mr. Locks' unwillingness to consider Mr. Sheppard's employment by the Trust was based upon Locks' belief that to do so would be to submit to the Court.

4. At least in part as a result of Mr. Locks' belief, the Trustees failed to select a manager, or indeed any employee, of the claims record center in a timely manner. This failure resulted in the Court's being required for a short period to assume responsibility as hereinafter described for the operation of the center.

5. Several weeks prior to the entry of the Confirmation Order the Court, in an effort to encourage and prepare the Trustees to act expeditiously pursuant to the Trust's mandate, dispatched the Clerk of the Bankruptcy Court to meet with the Trustees. At that meeting, held in Washington, D.C. on July 9, 1988, the Clerk endeavored to impress the Trustees with the fact that upon confirmation, Robins would no longer fund the existing claims facility, and that absent affirmative action taken by the Trustees the facility would close its doors. Despite the Clerk's as well as the Court's advice, as shown by the evidence, no effective effort was made by the Trustees and, as of the date of transition the Trust was completely unprepared to operate the facility.

6. Except for the Court's intervention in directing the Clerk to utilize court personnel to maintain the facility to give the Trustees further opportunity to retain employees and secure appropriate banking facilities, it would have closed. Such a consequence would have been an extreme disservice to the approximately 200,000 remaining claimants who had voted overwhelmingly in favor of the Plan of Reorganization and who were looking to a fulfillment of that Plan by the actions of the Trustees.

7. The Trustees' failure to prepare for acceptance of control over the Claims Facility, despite their knowledge of the possible effects of such failure, was attributable in part to Locks' refusal to acknowledge the Plan's provision transferring control to the Trustees and to Locks' belief that Robins would continue to maintain the Facility after confirmation. Locks took this position on control over the Facility despite Robins' prompt payment of $200,000 to the Trust for the purposes of maintaining the Facility on an interim basis.

8. Though the Trustees have selected a records facility director, a custodial bank, and interim counsel, they failed, as of the date of this hearing, to reach final agreement on any issue of importance.

9. The Court finds that the Trustees had initially agreed that law firms that had been heavily involved in the bankruptcy case and in the formulation of the

Plan of Reorganization should not represent the Trust. In spite of this initial decision, the law firm of Cadwalader, Wickersham & Taft ("Cadwalader"), which represented the Claimants' Committee, was among those considered, and was ultimately employed. This decision was reached with full knowledge that the firm was still counsel for Claimants' Committee and in the face of Judge Shelley's expressed view that the firm was disqualified by reason of a conflict of interest.

10. The vote to retain the Cadwalader firm was three to two, with Saltzburg and Feinberg voting against the retention. Both Saltzburg and Feinberg argued against employment of Cadwalader, with Saltzburg and Feinberg voting against employment of Cadwalader, with Saltzburg emphasizing that "the price which would have to be paid in terms of an inevitable battle over whether there was a conflict, and the wisdom of that choice, would be so high that it would be inconceivable that [the Trust] would want to pay it."

11. Mr. Locks, in his testimony at the hearing in this matter, admitted that he felt the retention of the Cadwalader firm would lead to further controversy as predicted by Mssrs. Saltzburg and Feinberg. Controversy of this nature is hardly a recommended ingredient leading to the early success of a public trust whose entire mission is to endeavor to fully and fairly satisfy its contemplated beneficiaries.

12. The delay engendered by the controversy over the selection of counsel and the ultimate retention of Cadwalader, however, cannot be laid solely at the feet of Mr. Locks. Mrs. Blum and Mrs. Samani were fully aware of the concerns and predictions of the minority Trustees, and participated actively in the choice of Cadwalader.

13. Cadwalader was the archetypical example of a firm which ought not to have been retained.

14. Although Locks now admits it was a mistake to hire the Claimants' Committee counsel to represent the Trust, he, like Mrs. Blum and Ms. Samani, has declined all offers from Mssrs. Feinberg and Saltzburg to join in their minority suggestion that the Trustees vote to dismiss Cadwalader as Trust counsel.

15. It is clear from the evidence, that the issue [the discharge of the Cadwalader firm] was raised on three separate occasions by Saltzburg, the last time following Judge Bryan's ruling which found the existence of an impermissible conflict of interest in Cadwalader's representation of the Trust.

16. As Saltzburg testified, this group of Trustees has been the most divisive he has worked with. He further stated that prior to September, six months after agreeing to hit the ground running for the benefit of the Trust, less time was spent on affirmative Trust business than was spent on discussion and actions pertaining to the retention of the Cadwalader firm.

17. It is clear from the record that consideration of Option 1 as hereinafter discussed was subordinated to the Trustees' preoccupation with Blum, Locks and Samani's insistence that the Trust retain the Cadwalader firm. The Trust accomplished very little since April.

18. As of October 31, 1988, more than six months after their appointment, no such claim form [Option 1] had been developed by the Trustees, nor had any payment amounts been established for the categories of claimants. Further, as of the date of this opinion, the Court is unaware of any final determinations concerning forms or amounts.

19. The Court relied in part upon the expert testimony of Francine Rabinowitz in estimating the value of the claims. The Trustees were free to seek advice as to the value of claims and were encouraged by the Court to consider meeting Ms. Rabinowitz promptly after their appointment. The Trustees did not meet with her until immediately prior to this hearing. Thus four months were allowed to go by before consultation with her, or so far as the Court knows, any of the other estimation experts, occurred.

20. The Plan called for prompt payment by the Trust of all holders of Dalkon Shield liquidated claims of personal injury claimants with interest from January 1, 1988. In spite of Section 4.03 of the Plan which provides "Dalkon Shield liquidated claims will be paid by the Trust as soon as practicable," the evidence before the Court is that it was September 8, 1988 before any effort to even ascertain who held liquidated claims commenced. As of the date of the hearing on the instant motion, which was more than three months subsequent to confirmation and almost six months after the Trustees agreed, at the Court's request, to prepare to act promptly in the likely event the Plan would be approved by a majority of claimants and confirmed by the Court, certain of the aforementioned liquidated claims had still not been paid.

21. Although Mr. Locks testified to having spent a great deal of time on Trust business throughout the late spring, summer and early fall of 1988, he was not until the day of the instant hearing even aware of crucial provisions of the pertinent documents. Locks stated he did not know that Section 4.07(c) of the Trust Agreement provides that in the event the Order of Confirmation is reversed on appeal funds already paid into the Trust can no longer be used to compensate Dalkon Shield claims.

22. The dilatory conduct of the Trustees may result in the non-payment of monies which claimants would have otherwise received had Option 1 been expeditiously effected. The Trustees' failure to act may require thousands of claimants to wait for compensation while the debtor goes "back to the drawing board" for plan formulation.

23. The Court finds it inconceivable that the Trustees of a $2.3 billion Trust would so ignore their responsibility to further the Trust's purposes. One may fairly conclude that the interests of the prospective beneficiaries was of secondary importance to these Trustees. The evidence before the Court shows the same three Trustees [Blum, Locks and Samani] have vocally or by their actions engaged in effort to thwart the law of the case and expended time, effort and Trust funds for that purpose to the ultimate delay and detriment to the Trust beneficiaries.

24. It simply is not in the best interest of this public Trust and its putative beneficiaries to permit a continuation in office of certain of these Trustees. Too much time and money has been wasted on matters unrelated to the principal purposes of the Trust. It is apparent from the evidence that the Trustees were divided to a point where they were not making decisions or progress.

25. In response to the instant motion, however, the Trustees contend that any further divisiveness among themselves has been eradicated. The Court believes that the appearance of an abatement of tensions is temporary and is the result of the motion which precipitated this hearing. The Court further believes that a lasting reduction of antagonisms among the Trustees can only be brought about through the removal of the obstructive Trustees.

26. Payment of the $2.3 billion to the Trust may not occur during the pendency of any appeal. If these funds were in the hands of the Trustees they would be drawing interest at the rate of $600,000 per day. The three Trustees, Blum, Locks and Samani supported the appeal of the Confirmation Order which exhibits disloyalty to the Trust and a lack of appreciation for the effect any further delay may have upon the beneficiaries.

27. Mrs. Samani's membership on the Claimants' Committee, which continued even after their appeal was noted, represented a breach of her obligation to the Trust.

28. All of the Trustees except Saltzburg have been paid the sum of $17,500 for six months salary between April and September 30, 1988, plus a total in excess of $111,000 for attendance at the meetings ($1,000 per meeting), as well as approximately $36,000 in expenses, as of the date of the filing of the instant motion. For this expenditure of Trust funds all

that has been fully accomplished is the retention of counsel which has been disqualified, the interim retention of replacement counsel, the retention of a Claims Facility director and one other person under contract, and the selection of a bank.

The district court found: that the legal issue presented is not to be resolved by bankruptcy law, but by application of the laws of Virginia, as required by § 6.07 of the Claimants' Trust Agreement; that the Trust is a public or court created Trust and is different from a private or testamentary trust; that under Virginia law the ordinary powers of the court of equity include the removal of trustees, and that good cause for removal is shown when such removal is in the best interest of the Trust.

The district court concluded:

In the court's view it is unnecessary to make a formal ruling that the good cause standard in the trust instrument governs the instant removal action instead of the best interests standard of Virginia law. The difference the court perceives between the cause standard and the best interests standard is one of direction. Under the good cause standard the court's evaluation is primarily a retrospective view of actions taken, or not taken, by the challenged trustees. Conversely, in applying the best interest standard, the court determines whether removal will enhance the future performance of the Trust. In any event, whether looking to the past or to the future, the court finds that it must remove trustees Barbara Blum, Gene Locks, and Ann Samani. Based on the evidence adduced at the hearing in this matter, the court finds that as a result of the debilitating disagreements which have been endemic among the Trustees, and of the concomitant inaction and delay, good cause for their removal exists. The court further finds that if no change in the composition of the trustees is effected the Trust's future holds only the prospect of further discord and delay, and that the best interests of both the Trust and its beneficiaries will be served by the removal of the above-named trustees.

The removed trustees appealed. Petitions to file amici curiae briefs were received from Ralph R. Mabey, as examiner, the Official Committee of Equity Security Holders, and trustees Feinberg and Saltzburg. These Petitions were granted and all of the amici briefs urge affirmance of the district court order removing the appellants.

II

■ Appellants contend that good cause for their removal has not been shown; that the court's interpretation of good cause is inconsistent with the laws of Virginia and the terms of the Plan and the Trust; that the district court's findings of fact are clearly erroneous; and that the personal involvement of the district court undermined its objectivity.

The present dispute is not between the removed trustees and the district court, although the appellants would like to present the controversy in that light. The court did not act *sua sponte* in bringing on the motion to remove the trustees. The motion was made under the third option in Section 3.03(c) of the Trust, a motion to remove filed on behalf of at least 100 beneficiaries represented by at least five independent and unaffiliated attorneys. The present motion was brought on behalf of more than 1800 beneficiaries and by the time of the trial, the number of beneficiaries exceeded 3,200, because of the large number of beneficiaries who intervened in support of the motion to remove.

The appellants attempt to present this case as a clash of personalities between the appellants and the district court and that this conflict is at the heart of the problems that have beset the Trust from its inception. We find this unpersuasive.[1] The ap-

---

1. This claim by appellants Blum, Locks, and Samani contradicts the statement they, with Trustees Feinberg and Saltzburg, filed in response to the action filed by the Official Dalkon Shield Claimants' Committee in No. 88–1753, which claimed that the district court was "interfering in the operation of the Trust". This statement was filed September 29, 1988, five days

pellants have spent so much time, money and energy trying to assert their independence from the district court, that they have neglected their primary duty of administering the trust so as to promptly pay the Dalkon Shield claimants. Such is manifest from the record, which is ample to support the findings of fact made by the district court. Since the district court's account of the evidence is plausible in light of the record viewed in its entirety, it may not be changed on appeal. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

### III

The Trust Agreement at § 3.03(c) provides for the removal of a trustee, and § 6.07 requires that the interpretation and validity of the Trust Agreement be governed by the laws of Virginia.

█ Appellants contend that the trustees may only be removed for "good cause" and that under Virginia law "good cause" requires a showing of fraud or gross negligence. The Petition to Remove does not allege fraud or dishonesty, and no attempt was made at the hearing to prove this type of misconduct. The Petition charges the trustees with negligence in the discharge or in the failure to discharge their duties, but the district court did not make a finding of negligence or gross negligence to support its order of removal. The district judge concluded that under Virginia law "good cause" requires an examination of the Trustees' prior acts or failures to act and also requires a consideration of what is in the best interest of the Trust and whether removal of challenged Trustees will enhance the further performance of the Trust.

Virginia Code § 26–3 (1985) provides that the court "under whose order ... such fiduciary derives his authority .. whenever from any cause it appears proper, [may] revoke and annul the powers of any such

fiduciary." This section requires reasonable notice to the fiduciary, which was provided in the present case. The Trustees of the Dalkon Shield Claimants' Trust were appointed to their fiduciary positions by the district court and the clear language of the statute does not set a standard of fraud or gross negligence for removal, as argued by appellants, but simply says "from any cause it appears proper." The Virginia courts have held that this language vests the appointing court with very large discretion in regard to the removal of a fiduciary. *Clark v. Grasty*, 210 Va. 33, 168 S.E.2d 268 (1969). *Nickels v. Horsley*, 126 Va. 54, 100 S.E. 831 (1919).

Virginia courts have not clearly defined "any cause" but have held that courts should consider "What is best for the trust estate?" *Willson v. Kable*, 177 Va. 668, 15 S.E.2d 56 (1941). *Willson* turns to Restatement on Trusts and Bogert, Trusts and Trustees to support its rule.

> Generally, the removal of a trustee is within the reasonable discretion of the court. More is required to remove a trustee appointed by the creator of the trust than is required to remove one appointed by the court. In all cases the real guide is whether or not it is best for the trust estate that the trustee be removed. Friction between the trustee and the beneficiary is not in itself sufficient ground for removal. Some beneficial end must be achieved by the removal or it will not be justified. Restatement, Trust, § 107; Bogert, Trusts and Trustees, vol. 3, § 527.

*Willson*, 177 Va. at 671, 15 S.E.2d at 59.

The district court has abundantly set forth its findings of fact supporting its conclusion that it is in the best interest of the Dalkon Shield Claimants' Trust that the three named trustees be removed. The interests of the beneficiaries of the Trust require that the Trustees act promptly in establishing procedures for the expeditious

---

after the present petition to remove Trustees Blum, Locks and Samani had been filed, and states:

> The Trustees reject any suggestion that the district court or anyone else is interfering in

the operation of the trust and, specifically, reject any implication that the Trustees' decisions are not made fully consonant with their individual and collective fiduciary responsibility.

payment of just claims. The delays occasioned by the three trustees have increased administrative costs, have delayed the full funding of the Trust, which when fully funded will produce approximately $600,000 per day in interest income, and have endangered the very life of the Plan by delays that could extend consummation past July 24, 1989, and allow American Home Products to revoke its offer of merger. Such revocation would eliminate the $2.3 billion contribution to the Trust.[2] They have delayed the adoption of Option 1 and payment to those claimants, who would accept payment thereunder, and they have also delayed paying Dalkon Shield liquidated claims "as promptly as practicable" as required by § 4.03 of the Plan.

█ Disharmony, animosity and friction among the Trustees will also support a removal under Virginia law. In *Sterling v. Blackwelder*, 383 F.2d 282, 286 (4th Cir. 1967) we stated:

> The main thrust of the attack in the district court was to rescind or otherwise invalidate the trust. Thus, the district court was not called upon to carefully consider, in the interest of proper administration, the possibility of substituting a trustee who might be able to overcome the obvious animosity between the parties and facilitate harmonious cooperation. Although we will not, on this record, ourselves order the removal of Leroy Blackwelder as the active trustee, we think that the district court, on remand, might properly consider whether such a course would be in the best interest of the trust estate and the various parties. See Va.Code §§ 26–48, –52; 1 Scott, Trusts § 107 (2d ed. 1956).

It is clear from the record and the district court's findings that there was division and disharmony among the Trustees. The district court found that harmony and cooperation among the Trustees could best be restored by removing Trustees Blum,

Lock and Samani. On the showing made at the hearing, we find this is a proper use of the considerable discretion allowed the appointing judge under Virginia law.

The law of Virginia is quite clear that the court appointing the Trustees has great discretion in determining proper cause for their removal. In *Reynolds v. Zink*, 68 Va. (27 Grat.) 29 (1876), the court stated:

> The statute, Code of 1860, ch. 132, § 11, has wisely deposited with "the court, under the order of which any (such) fiduciary derives his authority," the right and duty to revoke and annul his powers "whenever from any cause it appears proper."
>
> There must, of necessity, be vested in that court a very large discretion; and while it is a legal discretion, to be exercised in a proper case, an appellate court ought not to interfere, except in a case where manifest injustice has been done, or where it is plain that a proper case has not been made for the exercise of the powers which the legislature has specially conferred upon that court, from which the fiduciary derives his authority.

This is still the law of Virginia and the above quote in its entirety, is found in *Clark v. Grasty*, 210 Va. at 36, 168 S.E.2d at 271.

It is obvious from the record that a real bone of contention among the Trustees is the appointment of an attorney or a firm of attorneys to represent the Trustees and handle the many legal questions that will arise in the administration of the Dalkon Shield Claimants' Trust. Mr. Lock, Ms. Blum and Ms. Samani have refused to acknowledge that Mr. Drabkin and his firm, Cadwalader, Wickersham and Taft may have a conflict of interest because the firm has been and still is counsel to the Dalkon Shield Claimants' Committee. The remaining Trustees and the disqualification order of Chief Judge Albert Bryan, Jr. have found such a conflict, but this has not

---

**2.** Mr. Locks testified that he was not aware of this provision of the merger agreement. He was also unaware that under § 4.07(c) of the Trust Agreement if the Order of Confirmation were reversed on appeal, the $100,000,000 already paid into the Trust could no longer be used to compensate claimants. Mr. Locks testi-

fied that he was an experienced attorney in mass tort litigation, but months after he became a trustee of one of the largest trusts ever created, he was unfamiliar with critical provisions of the documents making up the Plan of Reorganization.

diminished the loyalty of the three Trustees to Mr. Drabkin. This is a throw-back to the former bankruptcy scenario when the lawyer for the largest number of creditors elected the Trustee, and the Trustee then employed the lawyer to represent him. Such activity is no longer acceptable. The first loyalty of the Trustees must be to the Trust and to the prompt and efficient exercise of their duties thereunder.

The district court has been handling the Dalkon Shield litigation since it began and has retained jurisdiction of the present bankruptcy proceedings. It has devoted a large part of its time to the handling of these matters and it is better positioned than we are to understand the conflicts among the Trustees, the delays that have been occasioned in the carrying out of the Plan of Reorganization and what is in the best interest of the Trust. Its findings of fact are not clearly erroneous and its conclusion that removal of the three Trustees will be in the best interest of the Trust is acceptable under the law of Virginia and the provisions of the Trust.

AFFIRMED.